KARCHER, SPEAKER, NEW JERSEY ASSEMBLY, ET
AL. *v.* DAGGETT ET AL.

No. 81–2057.   Argued March 2, 1983—Decided June 22, 1983

726

BRENNAN, J., delivered the opinion of the Court, in which MARSHALL, BLACKMUN, STEVENS, and O'CONNOR, JJ., joined. STEVENS, J., filed a concurring opinion, *post*, p. 744. WHITE, J., filed a dissenting opinion, in which BURGER, C. J., and POWELL and REHNQUIST, JJ., joined, *post*, p. 765. POWELL, J., filed a dissenting opinion, *post*, p. 784.

*Kenneth J. Guido, Jr.*, argued the cause for appellants. With him on the briefs were *Harry R. Sachse, Loftus E. Becker, Jr., Donald J. Simon, Clive S. Cummis, Charles J. Walsh, Jerald D. Baranoff, Leon J. Sokol, Michael D. Solomon, Lawrence T. Marinari,* and *Robert A. Farkas.*

*Bernard Hellring* argued the cause for appellees. With him on the brief were *Jonathan L. Goldstein, Robert S. Raymar,* and *Stephen L. Dreyfuss.**

JUSTICE BRENNAN delivered the opinion of the Court.

The question presented by this appeal is whether an apportionment plan for congressional districts satisfies Art. I, § 2, of the Constitution without need for further justification if the population of the largest district is less than one percent greater than the population of the smallest district. A three-judge District Court declared New Jersey's 1982 reapportionment plan unconstitutional on the authority of *Kirkpatrick* v. *Preisler,* 394 U. S. 526 (1969), and *White* v. *Weiser,* 412 U. S. 783 (1973), because the population deviations among districts, although small, were not the result of a good-faith effort to achieve population equality. We affirm.

I

After the results of the 1980 decennial census had been tabulated, the Clerk of the United States House of Representatives notified the Governor of New Jersey that the number of Representatives to which the State was entitled had decreased from 15 to 14. Accordingly, the New Jersey Legislature was required to reapportion the State's congressional districts. The State's 199th Legislature passed two reapportionment bills. One was vetoed by the Governor, and the second, although signed into law, occasioned significant dissatisfaction among those who felt it diluted minority voting strength in the city of Newark. See App. 83–84, 86–90. In response, the 200th Legislature returned to the problem of apportioning congressional districts when it convened in January 1982, and it swiftly passed a bill (S–711) introduced by Senator Feldman, President *pro tem* of the State Senate,

---

*Roger Allan Moore, Richard P. Foelber,* and *Michael A. Hess* filed a brief for the Republican National Committee as *amicus curiae* urging affirmance.

which created the apportionment plan at issue in this case. The bill was signed by the Governor on January 19, 1982, becoming Pub. L. 1982, ch. 1 (hereinafter Feldman Plan). A map of the resulting apportionment is appended *infra*.

Like every plan considered by the legislature, the Feldman Plan contained 14 districts, with an average population per district (as determined by the 1980 census) of 526,059.[1] Each district did not have the same population. On the average, each district differed from the "ideal" figure by 0.1384%, or about 726 people. The largest district, the Fourth District, which includes Trenton, had a population of 527,472, and the smallest, the Sixth District, embracing most of Middlesex County, a population of 523,798. The difference between them was 3,674 people, or 0.6984% of the average district. The populations of the other districts also varied. The Ninth District, including most of Bergen County, in the northeastern corner of the State, had a population of 527,349, while the population of the Third District, along the Atlantic shore, was only 524,825. App. 124.

The legislature had before it other plans with appreciably smaller population deviations between the largest and smallest districts. The one receiving the most attention in the District Court was designed by Dr. Ernest Reock, Jr., a political science professor at Rutgers University and Director of the Bureau of Government Research. A version of the Reock

---

[1] Three sets of census data are relevant to this case. In early 1981, the Bureau of the Census released preliminary figures showing that the total population of New Jersey was 7,364,158. In October 1981 it released corrected data, which increased the population of East Orange (and the State as a whole) by 665 people. Brief for Appellants 3, n. 1. All calculations in this opinion refer to the data available to the legislature—that is, the October 1981 figures. After the proceedings below had concluded, the Bureau of the Census made an additional correction in the population of East Orange, adding another 188 people, and bringing the total population of the State to 7,365,011. *Ibid.* Because this last correction was not available to the legislature at the time it enacted the plan at issue, we need not consider it.

Plan introduced in the 200th Legislature by Assemblyman Hardwick had a maximum population difference of 2,375, or 0.4514% of the average figure. *Id.*, at 133.

Almost immediately after the Feldman Plan became law, a group of individuals with varying interests, including all incumbent Republican Members of Congress from New Jersey, sought a declaration that the apportionment plan violated Art. I, § 2, of the Constitution[2] and an injunction against proceeding with the primary election for United States Representatives under the plan. A three-judge District Court was convened pursuant to 28 U. S. C. § 2284(a). The District Court held a hearing on February 26, 1982, at which the parties submitted a number of depositions and affidavits, moved for summary judgment, and waived their right to introduce further evidence in the event the motions for summary judgment were denied.

Shortly thereafter, the District Court issued an opinion and order declaring the Feldman Plan unconstitutional. Denying the motions for summary judgment and resolving the case on the record as a whole, the District Court held that the population variances in the Feldman Plan were not "unavoidable despite a good-faith effort to achieve absolute equality," see *Kirkpatrick, supra,* at 531. The court rejected appellants' argument that a deviation lower than the statistical imprecision of the decennial census was "the functional equivalent of mathematical equality." *Daggett* v. *Kimmelman,* 535 F. Supp. 978, 982–983 (NJ 1982). It also held that appellants had failed to show that the population variances were justified by the legislature's purported goals of preserving minor-

---

[2] In relevant part: "The House of Representatives shall be composed of Members chosen every second Year by the People of the several States . . . .

.        .        .        .        .

"Representatives . . . shall be apportioned among the several States which may be included within this Union, according to their respective Numbers . . . ."

ity voting strength and anticipating shifts in population. *Ibid.* The District Court enjoined appellants from conducting primary or general elections under the Feldman Plan, but that order was stayed pending appeal to this Court, 455 U. S. 1303 (1982) (BRENNAN, J., in chambers), and we noted probable jurisdiction, 457 U. S. 1131 (1982).

## II

Article I, § 2, establishes a "high standard of justice and common sense" for the apportionment of congressional districts: "equal representation for equal numbers of people." *Wesberry* v. *Sanders*, 376 U. S. 1, 18 (1964). Precise mathematical equality, however, may be impossible to achieve in an imperfect world; therefore the "equal representation" standard is enforced only to the extent of requiring that districts be apportioned to achieve population equality "as nearly as is practicable." See *id.*, at 7–8, 18. As we explained further in *Kirkpatrick* v. *Preisler:*

> "[T]he 'as nearly as practicable' standard requires that the State make a good-faith effort to achieve precise mathematical equality. See *Reynolds* v. *Sims*, 377 U. S. 533, 577 (1964). Unless population variances among congressional districts are shown to have resulted despite such effort, the State must justify each variance, no matter how small." 394 U. S., at 530–531.

Article I, § 2, therefore, "permits only the limited population variances which are unavoidable despite a good-faith effort to achieve absolute equality, or for which justification is shown." *Id.*, at 531. Accord, *White* v. *Weiser*, 412 U. S., at 790.

Thus two basic questions shape litigation over population deviations in state legislation apportioning congressional districts. First, the court must consider whether the population differences among districts could have been reduced or eliminated altogether by a good-faith effort to draw districts of equal population. Parties challenging apportionment leg-

islation must bear the burden of proof on this issue, and if they fail to show that the differences could have been avoided the apportionment scheme must be upheld. If, however, the plaintiffs can establish that the population differences were not the result of a good-faith effort to achieve equality, the State must bear the burden of proving that each significant variance between districts was necessary to achieve some legitimate goal. *Kirkpatrick,* 394 U. S., at 532; cf. *Swann* v. *Adams,* 385 U. S. 440, 443–444 (1967).

## III

Appellants' principal argument in this case is addressed to the first question described above. They contend that the Feldman Plan should be regarded *per se* as the product of a good-faith effort to achieve population equality because the maximum population deviation among districts is smaller than the predictable undercount in available census data.

## A

*Kirkpatrick* squarely rejected a nearly identical argument. "The whole thrust of the 'as nearly as practicable' approach is inconsistent with adoption of fixed numerical standards which excuse population variances without regard to the circumstances of each particular case." 394 U. S., at 530; see *White* v. *Weiser, supra,* at 790, n. 8, and 792–793. Adopting any standard other than population equality, using the best census data available, see 394 U. S., at 532, would subtly erode the Constitution's ideal of equal representation. If state legislators knew that a certain *de minimis* level of population differences was acceptable, they would doubtless strive to achieve that level rather than equality.[3] *Id.,* at

---

[3] There is some evidence in the record from which one could infer that this is precisely what happened in New Jersey. Alan Karcher, Speaker of the Assembly, testified that he had set one-percent maximum deviation as the upper limit for any plans to be considered seriously by the legislature, Record Doc. No. 41, pp. 56–58 (Karcher deposition), but there is no evi-

531.   Furthermore, choosing a different standard would import a high degree of arbitrariness into the process of reviewing apportionment plans.   *Ibid.*   In this case, appellants argue that a maximum deviation of approximately 0.7% should be considered *de minimis*.   If we accept that argument, how are we to regard deviations of 0.8%, 0.95%, 1%, or 1.1%?

Any standard, including absolute equality, involves a certain artificiality.   As appellants point out, even the census data are not perfect, and the well-known restlessness of the American people means that population counts for particular localities are outdated long before they are completed.   Yet problems with the data at hand apply equally to any population-based standard we could choose.[4]   As between two standards—equality or something less than equality—only the former reflects the aspirations of Art. I, § 2.

To accept the legitimacy of unjustified, though small population deviations in this case would mean to reject the basic premise of *Kirkpatrick* and *Wesberry*.   We decline appellants' invitation to go that far.   The unusual rigor of their standard has been noted several times.   Because of that rigor, we have required that absolute population equality be the paramount objective of apportionment only in the case of

---

dence of any serious attempt to seek improvements below the one-percent level.

[4] Such problems certainly apply to JUSTICE WHITE's concededly arbitrary five-percent solution, see *post,* at 782, apparently selected solely to avoid the embarrassment of discarding the actual result in *Kirkpatrick* along with its reasoning.   No *de minimis* line tied to actual population in any way mitigates differences identified *post,* at 771–772, between the number of adults or eligible, registered, or actual voters in any two districts.   As discussed below, see *infra,* at 736–738, unless some systematic effort is made to correct the distortions inherent in census counts of total population, deviations from the norm of population equality are far more likely to exacerbate the differences between districts.   If a State does attempt to use a measure other than total population or to "correct" the census figures, it may not do so in a haphazard, inconsistent, or conjectural manner.   *Kirkpatrick,* 394 U. S., at 534–535; see *infra,* at 740–741.

congressional districts, for which the command of Art. I, § 2, as regards the National Legislature outweighs the local interests that a State may deem relevant in apportioning districts for representatives to state and local legislatures, but we have not questioned the population equality standard for congressional districts. See, *e. g.*, *White* v. *Weiser*, 412 U. S., at 793; *White* v. *Regester*, 412 U. S. 755, 763 (1973); *Mahan* v. *Howell*, 410 U. S. 315, 321–323 (1973). The principle of population equality for congressional districts has not proved unjust or socially or economically harmful in experience. Cf. *Washington* v. *Dawson & Co.*, 264 U. S. 219, 237 (1924) (Brandeis, J., dissenting); B. Cardozo, The Nature of the Judicial Process 150 (1921). If anything, this standard should cause less difficulty now for state legislatures than it did when we adopted it in *Wesberry.* The rapid advances in computer technology and education during the last two decades make it relatively simple to draw contiguous districts of equal population and at the same time to further whatever secondary goals the State has.[5] Finally, to abandon unnecessarily a clear and oft-confirmed constitutional interpretation would impair our authority in other cases, *Florida Dept. of Health* v. *Florida Nursing Home Assn.*, 450 U. S. 147, 153–154 (1981) (STEVENS, J., concurring); *Pollock* v. *Farmers' Loan & Trust Co.*, 157 U. S. 429, 652 (1895) (White, J., dissenting), would implicitly open the door to a plethora of requests that we reexamine other rules that some may consider

---

[5] Note that many of the problems that the New Jersey Legislature encountered in drawing districts with equal population stemmed from the decision, which appellees never challenged, not to divide any municipalities between two congressional districts. The entire State of New Jersey is divided into 567 municipalities, with populations ranging from 329,248 (Newark) to 9 (Tavistock Borough). See Brief for Appellants 36, n. 38. Preserving political subdivisions intact, however, while perfectly permissible as a secondary goal, is not a sufficient excuse for failing to achieve population equality without the specific showing described *infra*, at 740–741. See *Kirkpatrick* v. *Preisler, supra*, at 533–534; *White* v. *Weiser*, 412 U. S. 783, 791 (1973).

burdensome, Cardozo, *supra*, at 149–150, and would prejudice those who have relied upon the rule of law in seeking an equipopulous congressional apportionment in New Jersey, see *Florida Nursing Home Assn.*, *supra*, at 154 (STEVENS, J., concurring). We thus reaffirm that there are no *de minimis* population variations, which could practicably be avoided, but which nonetheless meet the standard of Art. I, § 2, without justification.[6]

---

[6]JUSTICE WHITE objects that "the rule of absolute equality is perfectly compatible with 'gerrymandering' of the worst sort," *Wells* v. *Rockefeller*, 394 U. S. 542, 551 (1969) (Harlan, J., dissenting). *Post*, at 776. That may certainly be true to some extent: beyond requiring States to justify population deviations with explicit, precise reasons, which might be expected to have some inhibitory effect, *Kirkpatrick* does little to prevent what is known as gerrymandering. See generally Backstrom, Robins, & Eller, Issues in Gerrymandering: An Exploratory Measure of Partisan Gerrymandering Applied to Minnesota, 62 Minn. L. Rev. 1121, 1144–1159 (1978); cf. 394 U. S., at 534, n. 4. *Kirkpatrick*'s object, achieving population equality, is far less ambitious than what would be required to address gerrymandering on a constitutional level.

In any event, the additional claim that *Kirkpatrick* actually promotes gerrymandering (as opposed to merely failing to stop it) is completely empty. A federal principle of population equality does not prevent any State from taking steps to inhibit gerrymandering, so long as a good-faith effort is made to achieve population equality as well. See, *e. g.*, Colo. Const. Art. V, § 47 (guidelines as to compactness, contiguity, boundaries of political subdivisions, and communities of interest); Mass. Const., Amended Art. CI, § 1 (boundaries); N. Y. Elec. Law § 4–100(2) (McKinney 1978) (compactness and boundaries).

JUSTICE WHITE further argues that the lack of a *de minimis* rule encourages litigation and intrusion by federal courts into state affairs. *Post*, at 777–778. It cannot be gainsaid that the *de minimis* rule he proposes would have made litigation in this case unattractive. But experience proves that cases in which a federal court is called upon to invalidate an existing apportionment, and sometimes to substitute a court-ordered plan in its stead, frequently arise not because a newly enacted apportionment plan fails to meet the test of *Kirkpatrick*, but because partisan politics frustrate the efforts of a state legislature to enact a new plan after a recent census has shown that the existing plan is grossly malapportioned. See, *e. g.*, *Carstens* v. *Lamm*, 543 F. Supp. 68 (Colo. 1982); *Shayer* v. *Kirkpatrick*,

B

The sole difference between appellants' theory and the argument we rejected in *Kirkpatrick* is that appellants have proposed a *de minimis* line that gives the illusion of rationality and predictability: the "inevitable statistical imprecision of the census." They argue: "Where, as here, the deviation from ideal district size is less than the known imprecision of the census figures, that variation is the functional equivalent of zero." Brief for Appellants 18. There are two problems with this approach. First, appellants concentrate on the extent to which the census systematically undercounts actual population—a figure which is not known precisely and which, even if it were known, would not be relevant to this case. Second, the mere existence of statistical imprecision does not make small deviations among districts the functional equivalent of equality.

In the District Court and before this Court, appellants rely exclusively on an affidavit of Dr. James Trussell, a Princeton University demographer. See App. 97–104. Dr. Trussell's carefully worded statement reviews various studies of the undercounts in the 1950, 1960, and 1970 decennial censuses, and it draws three important conclusions: (1) "the undercount in the 1980 census is likely to be above one percent"; (2) "all the evidence to date indicates that all places are not undercounted to the same extent, since the undercount rate has been shown to depend on race, sex, age, income, and education"; and (3) "[t]he distribution of the undercount in New Jersey is . . . unknown, and I see no reason to believe that it would be uniformly spread over all municipalities." *Id.*, at 103–104. Assuming for purposes of argument that each of

541 F. Supp. 922 (WD Mo.), summarily aff'd, 456 U. S. 966 (1982); *O'Sullivan* v. *Brier*, 540 F. Supp. 1200 (Kan. 1982); *Donnelly* v. *Meskill*, 345 F. Supp. 962 (Conn. 1972); *David* v. *Cahill*, 342 F. Supp. 463 (NJ 1972); *Skolnick* v. *State Electoral Board of Illinois*, 336 F. Supp. 839 (ND Ill. 1971).

these statements is correct, they do not support appellants' argument.

In essence, appellants' one-percent benchmark is little more than an attempt to present an attractive *de minimis* line with a patina of scientific authority. Neither Dr. Trussell's statement nor any of appellants' other evidence specifies a precise level for the undercount in New Jersey, and Dr. Trussell's discussion of the census makes clear that it is impossible to develop reliable estimates of the undercount on anything but a nationwide scale. See *id.*, at 98–101. His conclusion that the 1980 undercount is "likely to be above one percent" seems to be based on the undercounts in previous censuses and a guess as to how well new procedures adopted in 1980 to reduce the undercount would work. Therefore, if we accepted appellants' theory that the national undercount level sets a limit on our ability to use census data to tell the difference between the populations of congressional districts, we might well be forced to set that level far above one percent when final analyses of the 1980 census are completed.[7]

As Dr. Trussell admits, *id.*, at 103, the existence of a one-percent undercount would be irrelevant to population deviations among districts if the undercount were distributed evenly among districts. The undercount in the census affects the accuracy of the *deviations* between districts only to the extent that the undercount varies from district to district. For a one-percent undercount to explain a one-percent deviation between the census populations of two districts, the undercount in the smaller district would have to be approximately three times as large as the undercount in the larger

---

[7] See generally J. Passel, J. Siegel, & J. Robinson, Coverage of the National Population in the 1980 Census, by Age, Sex, and Race: Preliminary Estimates by Demographic Analysis (Nov. 1981) (Record Doc. No. 31) (hereinafter Passel). Estimates for the national undercount in previous censuses range from 2.5% to 3.3%. See, *e. g.*, Panel on Decennial Census Plans, Counting the People in 1980: An Appraisal of Census Plans 2 (Nat. Acad. Sciences 1978).

district.[8]  It is highly unlikely, of course, that this condition holds true, especially since appellants have utterly failed to introduce evidence showing that the districts were designed to compensate for the probable undercount.  Dr. Trussell's affidavit states that the rate of undercounting may vary from municipality to municipality, but it does not discuss by how much it may vary, or to what extent those variations would be reflected at the district level, with many municipalities combined.  Nor does the affidavit indicate that the factors associated with the rate of undercounting—race, sex, age, etc.—vary from district to district, or (more importantly) that the populations in the smaller districts reflect the relevant factors more than the populations in the larger districts.[9]  As Dr. Trussell admits, the distribution of the undercount in New Jersey is completely unknown.  Only by bizarre coincidence could the systematic undercount in the

[8] As an example, assume that in a hypothetical State with two congressional districts District A has a population of 502,500, and District B has a population of 497,500.  The deviation between them is 5,000, or one percent of the mean.  If the statewide undercount is also one percent, and it is distributed evenly between the two districts, District A will have a "real" population of 507,525, and District B will have a "real" population of 502,475.  The deviation between them will remain one percent.  Only if three-fourths of the uncounted people in the State live in District B will the two districts have equal populations.  If three-fourths of the uncounted people happen to live in District A, the deviation between the two districts will increase to 1.98%.

[9] For instance, it is accepted that the rate of undercount in the census for black population on a nationwide basis is significantly higher than the rate of undercount for white population.  See generally Passel 9–20.  Yet the census population of the districts in the Feldman Plan is unrelated to the percentage of blacks in each district.  The Fourth District, for instance, is the largest district in terms of population, 0.268% above the mean; it has a 17.3% black population, App. 94.  The First District is 14.6% black, id., at 96, and it is almost exactly average in overall population.  The undercount in any particular district cannot be predicted only from the percentage of blacks in the district, but to the extent that blacks are not counted, the undercount would be more severe in the Fourth District than in the relatively less populous First District.

census bear some statistical relationship to the districts drawn by the Feldman Plan.

The census may systematically undercount population, and the rate of undercounting may vary from place to place. Those facts, however, do not render meaningless the differences in population between congressional districts, as determined by uncorrected census counts. To the contrary, the census data provide the only reliable—albeit less than perfect—indication of the districts' "real" relative population levels. Even if one cannot say with certainty that one district is larger than another merely because it has a higher census count, one *can* say with certainty that the district with a larger census count is more likely to be larger than the other district than it is to be smaller or the same size. That certainty is sufficient for decisionmaking. Cf. *City of Newark* v. *Blumenthal*, 457 F. Supp. 30, 34 (DC 1978). Furthermore, because the census count represents the "best population data available," see *Kirkpatrick*, 394 U. S., at 528, it is the only basis for good-faith attempts to achieve population equality. Attempts to explain population deviations on the basis of flaws in census data must be supported with a precision not achieved here. See *id.*, at 535.

## C

Given that the census-based population deviations in the Feldman Plan reflect real differences among the districts, it is clear that they could have been avoided or significantly reduced with a good-faith effort to achieve population equality. For that reason alone, it would be inappropriate to accept the Feldman Plan as "functionally equivalent" to a plan with districts of equal population.

The District Court found that several other plans introduced in the 200th Legislature had smaller maximum deviations than the Feldman Plan. 535 F. Supp., at 982. Cf. *White* v. *Weiser*, 412 U. S., at 790, and n. 9. Appellants object that the alternative plans considered by the District Court were not comparable to the Feldman Plan because

their political characters differed profoundly. See, *e. g.*, App. 93–96 (affidavit of S. H. Woodson, Jr.) (arguing that alternative plans failed to protect the interests of black voters in the Trenton and Camden areas). We have never denied that apportionment is a political process, or that state legislatures could pursue legitimate secondary objectives as long as those objectives were consistent with a good-faith effort to achieve population equality at the same time. Nevertheless, the claim that political considerations require population differences among congressional districts belongs more properly to the second level of judicial inquiry in these cases, see *infra*, at 740–741, in which the State bears the burden of justifying the differences with particularity.

In any event, it was unnecessary for the District Court to rest its finding on the existence of alternative plans with radically different political effects. As in *Kirkpatrick*, "resort to the simple device of transferring entire political subdivisions of known population between contiguous districts would have produced districts much closer to numerical equality." 394 U. S., at 532. Starting with the Feldman Plan itself and the census data available to the legislature at the time it was enacted, see App. 23–34, one can reduce the maximum population deviation of the plan merely by shifting a handful of municipalities from one district to another.[10]

---

[10] According to the population figures used by Dr. Reock, the following adjustments to the Feldman Plan as enacted in Pub. L. 1982, ch. 1, would reduce its maximum population variance to 0.449%, somewhat lower than the version of the Reock Plan introduced in the legislature: To the Fifth District, add Oakland and Franklin Lakes (from the Eighth District), and Hillsdale, Woodcliff Lake, and Norwood (from the Ninth District). To the Sixth District, add North Brunswick (from the Seventh District). To the Seventh District, add Roosevelt (from the Fourth District), and South Plainfield and Helmetta (from the Sixth District). To the Eighth District, add Montville and Boonton Town (from the Fifth District). To the Ninth District, add River Edge and Oradell (from the Fifth District).

Some of these changes are particularly obvious. Shifting the small town of Roosevelt from the Fourth to the Seventh District brings both appreciably closer to the mean, and the town is already nearly surrounded by the

See also *Swann* v. *Adams*, 385 U. S., at 445–446; n. 4, *supra*. Thus the District Court did not err in finding that the plaintiffs had met their burden of showing that the Feldman Plan did not come as nearly as practicable to population equality.

## IV

By itself, the foregoing discussion does not establish that the Feldman Plan is unconstitutional. Rather, appellees' success in proving that the Feldman Plan was not the product of a good-faith effort to achieve population equality means only that the burden shifted to the State to prove that the population deviations in its plan were necessary to achieve some legitimate state objective. *White* v. *Weiser* demonstrates that we are willing to defer to state legislative policies, so long as they are consistent with constitutional norms, even if they require small differences in the population of congressional districts. See 412 U. S., at 795–797; cf. *Upham* v. *Seamon*, 456 U. S. 37 (1982); *Connor* v. *Finch*, 431 U. S. 407, 414–415 (1977). Any number of consistently applied legislative policies might justify some variance, including, for instance, making districts compact, respecting municipal boundaries, preserving the cores of prior districts, and avoiding contests between incumbent Representatives. As long as the criteria are nondiscriminatory, see *Gomillion* v. *Lightfoot*, 364 U. S. 339 (1960), these are all legitimate objectives that on a proper showing could justify minor population deviations. See, *e. g.*, *West Virginia Civil Liberties Union* v.

Seventh District. Similarly, River Edge, Oradell, Norwood, and Montville are barely contiguous with their present districts and almost completely surrounded by the new districts suggested above. Further improvement could doubtless be accomplished with the aid of a computer and detailed census data. See also n. 5, *supra*.

We do not, of course, prejudge the validity of a plan incorporating these changes, nor do we indicate that a plan cannot represent a good-faith effort whenever a court can conceive of minor improvements. We point them out only to illustrate that further reductions could have been achieved within the basic framework of the Feldman Plan.

*Rockefeller*, 336 F. Supp. 395, 398–400 (SD W. Va. 1972) (approving plan with 0.78% maximum deviation as justified by compactness provision in State Constitution); cf. *Reynolds* v. *Sims*, 377 U. S. 533, 579 (1964); *Burns* v. *Richardson*, 384 U. S. 73, 89, and n. 16 (1966). The State must, however, show with some specificity that a particular objective required the specific deviations in its plan, rather than simply relying on general assertions. The showing required to justify population deviations is flexible, depending on the size of the deviations, the importance of the State's interests, the consistency with which the plan as a whole reflects those interests, and the availability of alternatives that might substantially vindicate those interests yet approximate population equality more closely. By necessity, whether deviations are justified requires case-by-case attention to these factors.

The possibility that a State could justify small variations in the census-based population of its congressional districts on the basis of some legitimate, consistently applied policy was recognized in *Kirkpatrick* itself. In that case, Missouri advanced the theory, echoed by JUSTICE WHITE in dissent, see *post*, at 771–772, that district-to-district differences in the number of eligible voters, or projected population shifts, justified the population deviations in that case. 394 U. S., at 534–535. We rejected its arguments not because those factors were impermissible considerations in the apportionment process, but rather because of the size of the resulting deviations and because Missouri "[a]t best . . . made haphazard adjustments to a scheme based on total population," made "no attempt" to account for the same factors in all districts, and generally failed to document its findings thoroughly and apply them "throughout the State in a systematic, not an *ad hoc*, manner." *Id.*, at 535.[11]

---

[11] The very cases on which *Kirkpatrick* relied made clear that the principle of population equality did not entirely preclude small deviations caused by adherence to consistent state policies. See *Swann* v. *Adams*, 385 U. S.

The District Court properly found that appellants did not justify the population deviations in this case. At argument before the District Court and on appeal in this Court, appellants emphasized only one justification for the Feldman Plan's population deviations—preserving the voting strength of racial minority groups.[12] They submitted affidavits from

440, 444 (1967); *Reynolds* v. *Sims*, 377 U. S. 533, 579 (1964). District Courts applying the *Kirkpatrick* standard have consistently recognized that small deviations could be justified. See, *e. g.*, *Doulin* v. *White*, 528 F. Supp. 1323, 1330 (ED Ark. 1982) (rejecting projected population shifts as justification for plan with 1.87% maximum deviation because largest district also had largest projected growth); *West Virginia Civil Liberties Union* v. *Rockefeller*, 336 F. Supp. 395, 398–400 (SD W. Va. 1972). Furthermore, courts using the *Kirkpatrick* standard to evaluate proposed remedies for unconstitutional apportionments have often, as in *White* v. *Weiser*, rejected the plan with the lowest population deviation in favor of plans with slightly higher deviations that reflected consistent state policies. See, *e. g.*, *David* v. *Cahill*, 342 F. Supp. 463 (NJ 1972); *Skolnick* v. *State Electoral Board of Illinois*, 336 F. Supp., at 842–846. A number of District Courts applying the *Kirkpatrick* test to apportionments of state legislatures, before this Court disapproved the practice in *Mahan* v. *Howell*, 410 U. S. 315 (1973), also understood that justification of small deviations was a very real possibility. *E. g.*, *Kelly* v. *Bumpers*, 340 F. Supp. 568, 571 (ED Ark. 1972), summarily aff'd, 413 U. S. 901 (1973); *Ferrell* v. *Oklahoma ex rel. Hall*, 339 F. Supp. 73, 84–85 (WD Okla.), summarily aff'd, 406 U. S. 939 (1972); *Sewell* v. *St. Tammany Parish Police Jury*, 338 F. Supp. 252, 255 (ED La. 1971). The court in *Graves* v. *Barnes*, 343 F. Supp. 704 (WD Tex. 1972)—later reversed by this Court for applying *Kirkpatrick* at all, *White* v. *Regester*, 412 U. S. 755 (1973)—characterized the inquiry required by *Kirkpatrick* as follows: "The critical issue remains the same: Has the State justified any and all variances, however small, on the basis of a consistent, rational State policy." 343 F. Supp., at 713; see *id.*, at 713–716.

[12] At oral argument in this Court, appellants stated that the drafters of the Feldman Plan were concerned with a number of other objectives as well, namely "to preserve the cores of existing districts" and "to preserve municipal boundaries." Tr. of Oral Arg. 4, 14. See also Answer and Counterclaim on Behalf of Alan J. Karcher ¶ 10 (Record Doc. No. 17). Similarly, Speaker Karcher's affidavit suggests that the legislature was concerned that the Ninth District should lie entirely within Bergen County. App. 84. None of these justifications was presented to the District Court or this Court in any but the most general way, however, and

Mayors Kenneth Gibson of Newark and Thomas Cooke of East Orange, discussing the importance of having a large majority of black voters in Newark's Tenth District, App. 86–92, as well as an affidavit from S. Howard Woodson, Jr., a candidate for Mayor of Trenton, comparing the Feldman Plan's treatment of black voters in the Trenton and Camden areas with that of the Reock Plan, *id.*, at 93–96. See also *id.*, at 82–83 (affidavit of A. Karcher). The District Court found, however:

"[Appellants] have not attempted to demonstrate, nor can they demonstrate, any causal relationship between the goal of preserving minority voting strength in the Tenth District and the population variances in the other districts. . . . We find that the goal of preserving minority voting strength in the Tenth District is not related in any way to the population deviations in the Fourth and Sixth Districts." 535 F. Supp., at 982.

Under the Feldman Plan, the largest districts are the Fourth and Ninth Districts, and the smallest are the Third and Sixth. See *supra*, at 728. None of these districts borders on the Tenth, and only one—the Fourth—is even mentioned in appellants' discussions of preserving minority voting strength. Nowhere do appellants suggest that the large population of the Fourth District was necessary to preserve minority voting strength; in fact, the deviation between the Fourth District and other districts has the effect of diluting the votes of all residents of that district, including members of racial minorities, as compared with other districts with fewer minority voters. The record is completely silent on the relationship between preserving minority voting

the relevant question presented by appellants to this Court excludes them: "Whether the legislative policy of preserving minority voting strength justifies small deviations from census population equality in a congressional reapportionment plan." Brief for Appellants i. Furthermore, several plans before the legislature with significantly lower population deviations kept municipalities intact and had an all-Bergen County Ninth District. See App. 66–74.

strength and the small populations of the Third and Sixth Districts. Therefore, the District Court's findings easily pass the "clearly erroneous" test.

## V

The District Court properly applied the two-part test of *Kirkpatrick* v. *Preisler* to New Jersey's 1982 apportionment of districts for the United States House of Representatives. It correctly held that the population deviations in the plan were not functionally equal as a matter of law, and it found that the plan was not a good-faith effort to achieve population equality using the best available census data. It also correctly rejected appellants' attempt to justify the population deviations as not supported by the evidence. The judgment of the District Court, therefore, is

*Affirmed.*

[Map of New Jersey Congressional Districts follows this page.]

JUSTICE STEVENS, concurring.

As an alternative ground for affirmance, the appellees contended at oral argument that the bizarre configuration of New Jersey's congressional districts is sufficient to demonstrate that the plan was not adopted in "good faith." This argument, as I understand it, is a claim that the district boundaries are unconstitutional because they are the product of political gerrymandering. Since my vote is decisive in this case, it seems appropriate to explain how this argument influences my analysis of the question that divides the Court. As I have previously pointed out, political gerrymandering is one species of "vote dilution" that is proscribed by the Equal Protection Clause.[1] Because an adequate judicial analysis of

---

[1] See *Cousins* v. *City Council of Chicago*, 466 F. 2d 830, 848–853 (CA7) (Stevens, J., dissenting), cert. denied, 409 U. S. 893 (1972); *Mobile* v. *Bolden*, 446 U. S. 55, 86–89 (1980) (STEVENS, J., concurring in judgment); *Rogers* v. *Lodge*, 458 U. S. 613, 652 (1982) (STEVENS, J., dissenting).

**NEW JERSEY**

**Congressional Districts**

**1983**

a gerrymandering claim raises special problems, I shall comment at some length on the legal basis for a gerrymandering claim, the standards for judging such a claim, and their relevance to the present case.

## I

Relying on Art. I, § 2, of the Constitution, as interpreted in *Wesberry* v. *Sanders*, 376 U. S. 1 (1964), and subsequent cases, appellees successfully challenged the congressional districting plan adopted by the New Jersey Legislature. For the reasons stated in JUSTICE BRENNAN's opinion for the Court, which I join, the doctrine of *stare decisis* requires that result. It can be demonstrated, however, that the holding in *Wesberry*, as well as our holding today, has firmer roots in the Constitution than those provided by Art. I, § 2.

The constitutional mandate contained in Art. I, § 2, concerns the number of Representatives that shall be "apportioned *among* the several States."[2] The section says nothing about the composition of congressional districts *within* a State.[3] Indeed, the text of that section places no restriction whatsoever on the power of any State to define the group of persons within the State who may vote for particular candidates. If a State should divide its registered voters into separate classes defined by the alphabetical order of their initials, by their age, by their period of residence in the State, or even by their political affiliation, such a classification would not be barred by the text of Art. I, § 2, even if the classes contained widely different numbers of voters.

---

[2] Article I, § 2, provides, in part:

"Representatives and direct Taxes shall be apportioned *among* the several States which may be included within this Union, according to their respective Numbers, which shall be determined by adding to the whole Number of free Persons, including those bound to Service for a Term of Years, and excluding Indians not taxed, three fifths of all other Persons." U. S. Const., Art. I, § 2, cl. 3 (emphasis supplied).

[3] During the first 50 years of our Nation's history, it was a widespread practice to elect Members of the House of Representatives as a group on a statewide basis. *Wesberry* v. *Sanders*, 376 U. S. 1, 8 (1964).

As Justice Harlan pointed out in his dissenting opinion in *Wesberry*, prior to the Civil War the principle of numerical equality of representation was actually contradicted by the text of Art. I, § 2, which provided that the "whole Number of free Persons" should be counted, that certain Indians should be excluded, and that only "three-fifths of all other Persons" should be added to the total.[4]  In analyzing the Constitution, we cannot ignore the regrettable fact that, as originally framed, it expressly tolerated the institution of slavery.  On the other hand, neither can we ignore the basic changes caused by the Civil War Amendments.  They planted the roots that firmly support today's holding.

The abolition of slavery and the guarantees of citizenship and voting rights contained in the Thirteenth, Fourteenth, and Fifteenth Amendments effectively repealed Art. I, § 2's requirement that some votes be given greater weight than others.  It remains true, however, that Art. I, § 2, does not itself contain any guarantee of equality of representation. The source of that guarantee must be found elsewhere.  But as Justice Clark perceptively noted in his partial concurrence

---

[4] "Representatives were to be apportioned among the States on the basis of free population plus three-fifths of the slave population.  Since no slave voted, the inclusion of three-fifths of their number in the basis of apportionment gave the favored States representation far in excess of their voting population.  If, then, slaves were intended to be without representation, Article I did exactly what the Court now says it prohibited: it 'weighted' the vote of voters in the slave States.  Alternatively, it might have been thought that Representatives elected by free men of a State would speak also for the slaves.  But since the slaves added to the representation only of their own State, Representatives from the slave States could have been thought to speak only for the slaves of their own States, indicating both that the Convention believed it possible for a Representative elected by one group to speak for another nonvoting group and that Representatives were in large degree still thought of as speaking for the whole population *of a State*." *Id.*, at 27–28.

Reading a "one person, one vote" requirement into Art. I, § 2, is historically as well as textually unsound.  See Kelly, Clio and the Court: An Illicit Love Affair, 1965 S. Ct. Rev. 119, 135–136.

in *Wesberry*—and as Justice Black had written earlier in his dissent in *Colegrove* v. *Green*, 328 U. S. 549, 569 (1946)—that guarantee is firmly grounded in the Equal Protection Clause of the Fourteenth Amendment.[5]  Even Justice Harlan's powerful dissent in *Wesberry* could find no flaw in that analysis.

In its review of state laws redefining congressional districts subsequent to *Wesberry* v. *Sanders*, the Court has not found it necessary to rely on the Equal Protection Clause. That Clause has, however, provided the basis for applying the "one person, one vote" standard to other electoral districts.  See, *e. g.*, *Baker* v. *Carr*, 369 U. S. 186 (1962); *Reynolds* v. *Sims*, 377 U. S. 533 (1964); *Avery* v. *Midland County*, 390 U. S. 474 (1968).  Even if Art. I, § 2, were wholly disregarded, the "one person, one vote" rule would unquestionably apply to action by state officials defining congressional districts just as it does to state action defining state legislative districts.[6]

---

[5] That Clause "does not permit the States to pick out certain qualified citizens or groups of citizens and deny them the right to vote at all . . . .  No one would deny that the equal protection clause would also prohibit a law that would expressly give certain citizens a half-vote and others a full vote. The probable effect of the 1901 State Apportionment Act in the coming election will be that certain citizens, and among them the appellants, will in some instances have votes only one-ninth as effective in choosing representatives to Congress as the votes of other citizens.  Such discriminatory legislation seems to me exactly the kind that the equal protection clause was intended to prohibit."  *Colegrove* v. *Green*, 328 U. S., at 569 (Black, J., dissenting), quoted in part in *Wesberry* v. *Sanders*, *supra*, at 19 (Clark, J., concurring in part and dissenting in part).

[6] The "one person, one vote" rule, like the Equal Protection Clause in which it is firmly grounded, provides protection against more than one form of discrimination.  In the cases in which the rule was first developed, district boundaries accorded significantly less weight to individual votes in the most populous districts.  But it was also clear that those boundaries maximized the political strength of rural voters and diluted the political power of urban voters.  See A. Hacker, Congressional Districting: The Issue of Equal Representation 20–26 (1963); see generally Standards for Congressional Districts (Apportionment), Hearings before Subcommittee No. 2 of the House Committee on the Judiciary on H. R. 73, H. R. 575,

The Equal Protection Clause requires every State to govern impartially. When a State adopts rules governing its election machinery or defining electoral boundaries, those rules must serve the interests of the entire community. See *Reynolds* v. *Sims, supra,* at 565–566. If they serve no purpose other than to favor one segment—whether racial, ethnic, religious, economic, or political—that may occupy a position of strength at a particular point in time, or to disadvantage a politically weak segment of the community, they violate the constitutional guarantee of equal protection.

In *Gomillion* v. *Lightfoot,* 364 U. S. 339, 340 (1960), the Court invalidated a change in the city boundaries of Tuskegee, Alabama, "from a square to an uncouth twenty-eight-sided figure" excluding virtually all of the city's black voters. The Court's opinion identified the right that had been violated as a group right:

> "When a legislature thus singles out a readily isolated segment of a racial minority for special discriminatory treatment, it violates the Fifteenth Amendment. In no case involving unequal weight in voting distribution that has come before the Court did the decision sanction a differentiation on racial lines whereby approval was given to unequivocal withdrawal of the vote solely from colored citizens." *Id.,* at 346.

Although the Court explicitly rested its decision on the Fifteenth Amendment, the analysis in Justice Whittaker's concurring opinion—like Justice Clark's in *Wesberry*—is equally coherent, see 364 U. S., at 349. Moreover, the Court has subsequently treated *Gomillion* as though it had been decided on equal protection grounds. See *Whitcomb* v. *Chavis,* 403 U. S. 124, 149 (1971).

---

H. R. 8266, and H. R. 8473, 86th Cong., 1st Sess., 65–90 (1959). The primary consequence of the rule has been its protection of the individual voter, but it has also provided one mechanism for identifying and curtailing discrimination against cognizable groups of voters.

*Gomillion* involved complete geographical exclusion of a racially identified group. But in case after case arising under the Equal Protection Clause the Court has suggested that "dilution" of the voting strength of cognizable *political* as well as racial groups may be unconstitutional. Thus, the question reserved in *Fortson* v. *Dorsey*, 379 U. S. 433, 439 (1965), related to an apportionment scheme that might "operate to minimize or cancel out the voting strength of racial or political elements of the voting population." See also *Gaffney* v. *Cummings*, 412 U. S. 735, 751, 754 (1973); *White* v. *Regester*, 412 U. S. 755, 765–770 (1973); *Whitcomb* v. *Chavis, supra,* at 143–144; *Burns* v. *Richardson*, 384 U. S. 73, 88–89 (1966). In his separate opinion in *Williams* v. *Rhodes*, 393 U. S. 23, 39 (1968), Justice Douglas pointed out that the Equal Protection Clause protects "voting rights and political groups . . . as well as economic units, racial communities, and other entities." And in *Abate* v. *Mundt*, 403 U. S. 182, 187 (1971), the Court noted the absence of any "built-in bias tending to favor particular political interests or geographic areas." In his dissenting opinion today, JUSTICE WHITE seems to agree that New Jersey's plan would violate the Equal Protection Clause if it "invidiously discriminated against a racial or political group." *Post,* at 783.

There is only one Equal Protection Clause. Since the Clause does not make some groups of citizens more equal than others, see *Zobel* v. *Williams*, 457 U. S. 55, 71 (1982) (BRENNAN, J., concurring), its protection against vote dilution cannot be confined to racial groups. As long as it proscribes gerrymandering against such groups, its proscription must provide comparable protection for other cognizable groups of voters as well. As I have previously written:

"In the line-drawing process, racial, religious, ethnic, and economic gerrymanders are all species of political gerrymanders.

"From the standpoint of the groups of voters that are affected by the line-drawing process, it is also important

to recognize that it is the group's interest in gaining or maintaining political power that is at stake. The mere fact that a number of citizens share a common ethnic, racial, or religious background does not create the need for protection against gerrymandering. It is only when their common interests are strong enough to be manifested in political action that the need arises. For the political strength of a group is not a function of its ethnic, racial, or religious composition; rather it is a function of numbers—specifically the number of persons who will vote in the same way." *Mobile* v. *Bolden*, 446 U. S. 55, 88 (1980) (concurring in judgment).

See *Cousins* v. *City Council of Chicago*, 466 F. 2d 830, 851–852 (CA7) (Stevens, J., dissenting), cert. denied, 409 U. S. 893 (1972).[7]

## II

Like JUSTICE WHITE, I am convinced that judicial preoccupation with the goal of perfect population equality is an inadequate method of judging the constitutionality of an apportionment plan. I would not hold that an obvious gerrymander is wholly immune from attack simply because it comes closer to perfect population equality than every competing plan. On the other hand, I do not find any virtue in the proposal to relax the standard set forth in *Wesberry* and subsequent cases, and to ignore population disparities after some arbitrarily defined threshold has been crossed.[8] As one com-

---

[7] Similarly, the motivation for the gerrymander turns on the political strength of members of the group, derived from cohesive voting patterns, rather than on the source of their common interests. 466 F. 2d, at 852.

[8] The former would appear to be consistent with what the Court has written in this case, *ante*, at 734–735, n. 6; the latter would be consistent with what JUSTICE WHITE has written in dissent, *post*, at 780–783. Either of these approaches would leave the door to unrestricted gerrymandering wide open. See Engstrom, The Supreme Court and Equipopulous Gerrymandering: A Remaining Obstacle in the Quest for Fair and Effective Representation, 1976 Ariz. State L. J. 277, 285–286, 296; Baker, Quantita-

mentator has written: "Logic, as well as experience, tells us . . . that there can be no total sanctuaries in the political thicket, else unfairness will simply shift from one form to another." [9] Rather, we should supplement the population equality standard with additional criteria that are no less "judicially manageable." In evaluating equal protection challenges to districting plans, just as in resolving such attacks on other forms of discriminatory action, I would consider whether the plan has a significant adverse impact on an identifiable political group, whether the plan has objective indicia of irregularity, and then, whether the State is able to produce convincing evidence that the plan nevertheless serves neutral, legitimate interests of the community as a whole.

Until two decades ago, constrained by its fear of entering a standardless political thicket, the Court simply abstained from any attempt to judge the constitutionality of legislative apportionment plans, even when the districts varied in population from 914,053 to 112,116. See *Colegrove* v. *Green*, 328 U. S., at 557. In *Baker* v. *Carr*, 369 U. S. 186 (1962), and *Reynolds* v. *Sims*, 377 U. S. 533 (1964), the Court abandoned that extreme form of judicial restraint and enunciated the "one person, one vote" principle. That standard is "judicially manageable" because census data are concrete and reasonably reliable and because judges can multiply and divide.

Even as a basis for protecting voters in their individual capacity, the "one person, one vote" approach has its shortcomings. Although population disparities are easily quantified, the standard provides no measure of the significance of any numerical difference. It is easy to recognize the element of

---

tive and Descriptive Guidelines to Minimize Gerrymandering, 219 Annals N. Y. Acad. Sci. 200, 208 (1973) ("If more specific guidelines to minimize gerrymandering are not forthcoming, then a great democratic principle—one man, one vote—will have degenerated into a simplistic arithmetical facade for discriminatory cartography on an extensive scale").

[9] Dixon, The Court, the People, and "One Man, One Vote," in Reapportionment in the 1970s, p. 32 (N. Polsby ed. 1971).

unfairness in allowing 112,116 voters to elect one Congressman while another is elected by 914,053.   But how significant is the difference between census counts of 527,472 and 523,798?   Given the birth rate, the mortality rate, the transient character of modern society, and the acknowledged errors in the census, we all know that such differences may vanish between the date of the census and the date of the next election.   Absolute population equality is impossible to achieve.

More important, mere numerical equality is not a sufficient guarantee of equal representation.   Although it directly protects individuals, it protects groups only indirectly at best. See *Reynolds* v. *Sims, supra,* at 561.   A voter may challenge an apportionment scheme on the ground that it gives his vote less weight than that of other voters; for that purpose it does not matter whether the plaintiff is combined with or separated from others who might share his group affiliation.   It is plainly unrealistic to assume that a smaller numerical disparity will *always* produce a fairer districting plan.   Indeed, as Justice Harlan correctly observed in *Wells* v. *Rockefeller,* 394 U. S. 542, 551 (1969), a standard "of absolute equality is perfectly compatible with 'gerrymandering' of the worst sort.   A computer may grind out district lines which can totally frustrate the popular will on an overwhelming number of critical issues."   Since Justice Harlan wrote, developments in computer technology have made the task of the gerrymanderer even easier.   See *post,* at 776 (WHITE, J., dissenting).[10]

---

[10] Computers now make it possible to generate a large number of alternative plans, consistent with equal population guidelines and various other criteria, in a relatively short period of time, and to analyze the political characteristics of each one in considerable detail.   In contrast, "[i]n the 1970's round of reapportionment, some states were barely able to generate a single reapportionment plan in the time allotted to the task."   National Conference of State Legislatures, Reapportionment: Law and Technology 55 (June 1980); see also Engstrom, *supra* n. 8, at 281–282.

The imperfections in the numerical standard do not, of course, render it useless. It provides one neutral criterion for evaluating a districting plan. Numerical disparities may provide sufficient basis for shifting the burden of justification to the State. Moreover, if all other factors were in equipoise, it would be proper to conclude that the plan that most nearly attains the goal of complete equality would be the fairest plan. The major shortcoming of the numerical standard is its failure to take account of other relevant—indeed, more important—criteria relating to the fairness of group participation in the political process. To that extent, it may indeed be counterproductive. See *Gaffney* v. *Cummings*, 412 U. S., at 748–749.[11]

To a limited extent the Court has taken cognizance of discriminatory treatment of groups of voters. The path the Court has sometimes used to enter this political thicket is marked by the label "intent." A finding that the majority deliberately sought to make it difficult for a minority group to elect representatives may provide a sufficient basis for holding that an objectively neutral electoral plan is unconstitutional. See *Rogers* v. *Lodge*, 458 U. S. 613, 616–617 (1982). For reasons that I have already set forth at length, this standard is inadequate. See *id.*, at 642–650 (STEVENS, J., dissenting); *Mobile* v. *Bolden*, 446 U. S., at 83 (STEVENS, J., concurring in judgment). I would not condemn a legislature's districting plan in the absence of discriminatory impact simply because its proponents were motivated, in part, by partisanship or group animus. Legislators are, after all, politicians; it is unrealistic to attempt to proscribe all political considerations in the essentially political process of redistricting. In the long run, constitutional adjudication that is premised on a case-by-case appraisal of the subjective intent of local decisionmakers

---

[11] See Edwards, The Gerrymander and "One Man, One Vote," 46 N. Y. U. L. Rev. 879 (1971); Elliott, Prometheus, Proteus, Pandora, and Procrustes Unbound: The Political Consequences of Reapportionment, 37 U. Chi. L. Rev. 474, 483–488 (1970); Engstrom, *supra* n. 8.

cannot possibly satisfy the requirement of impartial adminis-
tration of the law that is embodied in the Equal Protection
Clause of the Fourteenth Amendment.  On the other hand,
if a plan has a significant adverse impact upon a defined
political group, an additional showing that it departs dramati-
cally from neutral criteria should suffice to shift the task of
justification to the state defendants.

For a number of reasons, this is a burden that plaintiffs can
meet in relatively few cases.  As a threshold matter, plain-
tiffs must show that they are members of an identifiable
political group whose voting strength has been diluted.  They
must first prove that they belong to a politically salient class,
see *supra*, at 749–750, one whose geographical distribution is
sufficiently ascertainable that it could have been taken into
account in drawing district boundaries.[12]  Second, they must
prove that in the relevant district or districts or in the State
as a whole, their proportionate voting influence has been
adversely affected by the challenged scheme.[13]  Third, plain-

---

[12] Identifiable groups will generally be based on political affiliation, race,
ethnic group, national origin, religion, or economic status, but other char-
acteristics may become politically significant in a particular context.  See
Clinton, Further Explorations in the Political Thicket: The Gerrymander
and the Constitution, 59 Iowa L. Rev. 1, 38–39 (1973) (cognizable interest
group with coherent and identifiable legislative policy); Comment, Political
Gerrymandering: A Statutory Compactness Standard as an Antidote for
Judicial Impotence, 41 U. Chi. L. Rev. 398, 407–408 (1974) (clearly identifi-
able and stable group).

[13] The difficulty in making this showing stems from the existence of alter-
native strategies of vote dilution.  Depending on the circumstances, vote
dilution may be demonstrated if a population concentration of group mem-
bers has been fragmented among districts, or if members of the group have
been overconcentrated in a single district greatly in excess of the percent-
age needed to elect a candidate of their choice.  See *Mobile* v. *Bolden*, 446
U. S., at 91, and n. 13 (STEVENS, J., concurring in judgment); Hacker,
*supra* n. 6, at 46–50; cf. Note, Compensatory Racial Reapportionment, 25
Stan. L. Rev. 84, 97–100 (1972) (pointing to the shortcomings of several
tests of political strength, including opportunity to cast swing votes and
opportunity to elect a representative of their own group).

In litigation under the Voting Rights Act, federal courts have developed
some familiarity with the problems of identifying and measuring dilution of

tiffs must make a prima facie showing that raises a rebuttable presumption of discrimination.

One standard method by which members of a disadvantaged political group may establish a dilution of their voting rights is by reliance on the "one person, one vote" principle, which depends on a statewide statistical analysis. But prima facie evidence of gerrymandering can surely be presented in other ways. One obvious type of evidence is the shape of the district configurations themselves. One need not use Justice Stewart's classic definition of obscenity—"I know it when I see it"[14]—as an ultimate standard for judging the constitutionality of a gerrymander to recognize that dramatically irregular shapes may have sufficient probative force to call for an explanation.[15]

Substantial divergences from a mathematical standard of compactness may be symptoms of illegitimate gerrymandering. As Dr. Ernest Reock, Jr., of Rutgers University has written: "Without some requirement of compactness, the boundaries of a district may twist and wind their way across the map in fantastic fashion in order to absorb scattered

---

racial group voting strength. Some of the concepts developed for statutory purposes might be applied in adjudicating constitutional claims by other types of political groups. The threshold showing of harm may be more difficult for adherents of a political party than for members of a racial group, however, because there are a number of possible base-line measures for a party's strength, including voter registration and past vote-getting performance in one or more election contests. See generally Backstrom, Robins, & Eller, Issues in Gerrymandering: An Exploratory Measure of Partisan Gerrymandering Applied to Minnesota, 62 Minn. L. Rev. 1121, 1131–1139 (1978).

[14] *Jacobellis* v. *Ohio*, 378 U. S. 184, 197 (1964).

[15] Professor Dixon quite properly warns against *defining* gerrymandering in terms of odd shapes. See R. Dixon, Democratic Representation: Reapportionment in Law and Politics 459–460 (1968). At the same time, however, he recognizes that a rule of compactness and contiguity, "if used merely to force an explanation for odd-shaped districts, can have much merit." *Id.*, at 460. See L. Tribe, American Constitutional Law 760 (1978) (oddity of district's shape, coupled with racial distribution of the population, should shift the burden of justification to the State).

pockets of partisan support."[16]   To some extent, geographi-
cal compactness serves independent values; it facilitates
political organization, electoral campaigning, and constituent
representation.[17]   A number of state statutes and Constitu-
tions require districts to be compact and contiguous.   These
standards have been of limited utility because they have not
been defined and applied with rigor and precision.[18]   Yet
Professor Reock and other scholars have set forth a number
of methods of measuring compactness that can be computed
with virtually the same degree of precision as a population
count.[19]   It is true, of course, that the significance of a par-

[16] Reock, Measuring Compactness as a Requirement of Legislative Ap-
portionment, 5 Midwest J. Pol. Sci. 70, 71 (1961).   Cf. Backstrom, Robins,
& Eller, *supra* n. 13, at 1126, 1137 (compactness standard cannot eliminate
gerrymandering but may reduce the band of discretion available to those
drawing district boundaries).   It is of course possible to dilute a group's
voting strength even if all districts are relatively compact.   Engstrom,
*supra* n. 8, at 280.

[17] See Taylor, A New Shape Measure for Evaluating Electoral District
Patterns, 67 Am. Pol. Sci. Rev. 947, 948 (1973).   Compactness is not to be
confused with physical area.   As we stated in *Reynolds* v. *Sims*, 377 U. S.
533, 580 (1964): "Modern developments and improvements in transporta-
tion and communications make rather hollow, in the mid-1960's, most
claims that deviations from population-based representation can validly be
based solely on geographical considerations.   Arguments for allowing such
deviations in order to insure effective representation for sparsely settled
areas and to prevent legislative districts from becoming so large that the
availability of access of citizens to their representatives is impaired are
today, for the most part, unconvincing."   Nevertheless, although low
population density may require geographically extensive districts, differ-
ent questions are presented by the creation of districts with distorted
shapes and irregular, indented boundaries.

[18] One state statute and 21 State Constitutions explicitly require that dis-
tricts be compact; two state statutes and 27 Constitutions explicitly pro-
vide that districts be formed of contiguous territory.   See Congressional
Research Service, State Constitutional and Statutory Provisions Concern-
ing Congressional and State Legislative Redistricting (June 1981).   But
see Clinton, *supra* n. 12, at 2 (ineffective enforcement); Comment, *supra*
n. 12, at 412–413.

[19] The scholarly literature suggests a number of different mathematical
measures of compactness, each focusing on different variables.   One rela-

ticular compactness measure may be difficult to evaluate, but as the figures in this case demonstrate, the same may be said of population disparities. In addition, although some deviations from compactness may be inescapable because of the geographical configuration or uneven population density of a particular State,[20] the relative degrees of compactness of dif-

---

tively simple method is to measure the relationship between the area of the district and the area of the smallest possible circumscribing circle. See Reock, *supra* n. 16, at 71. This calculation is particularly sensitive to the degree of elongation of a given shape. Another simple method is to determine the ratio of a figure's perimeter to the circumference of the smallest possible circumscribing circle, a measurement that is well suited to measuring the degree of indentation. See Schwartzberg, Reapportionment, Gerrymanders, and the Notion of "Compactness," 50 Minn. L. Rev. 443–452 (1966). Other measures of compactness are based on the aggregate of the distances from the district's geometrical or population-weighted center of gravity to each of its points, see Kaiser, An Objective Method for Establishing Legislative Districts, 10 Midwest J. Pol. Sci. 200–223 (1966); Weaver & Hess, A Procedure for Nonpartisan Districting: Development of Computer Techniques, 73 Yale L. J. 288, 296–300 (1963); the degree of indentation of the boundaries of a nonconvex district, see Taylor, *supra* n. 17; the aggregate length of district boundaries, see Common Cause, Toward a System of "Fair and Effective Representation" 54–55 (1977); Adams, Statute: A Model State Apportionment Process: The Continuing Quest for "Fair and Effective Representation," 14 Harv. J. Legis. 825, 875–876, and n. 184 (1977); Edwards, *supra* n. 11, at 894; Walker, One Man-One Vote: In Pursuit Of an Elusive Ideal, 3 Hastings Const. L. Q. 453, 475 (1976); and the ratio of the maximum to the minimum diameters in a district, R. Morrill, Political Redistricting and Geographic Theory 22 (1981). In each case, the smaller the measurement, the more compact the district or districts. See also 1980 Iowa Acts, ch. 1021, § 4b(3)c (setting forth alternative geometrical tests for determining relative compactness of alternative districting plans: the absolute value of the difference between the length and width of the district, and the "ratio of the dispersion of population about the population center of the district to the dispersion of population about the geographic center of the district").

[20] If a State's political subdivisions have oddly shaped boundaries, adhering to these boundaries may detract from geographical compactness. See Colo. Rev. Stat. §§ 2–2–105, 2–2–203 (1980) (legislative explanations that variations from compactness were caused by "the shape of county boundary lines, census enumeration lines, natural boundaries, population den-

ferent district maps can always be compared. As with the numerical standard, it seems fair to conclude that drastic departures from compactness are a signal that something may be amiss.

Extensive deviation from established political boundaries is another possible basis for a prima facie showing of gerrymandering. As we wrote in *Reynolds* v. *Sims:* "Indiscriminate districting, without any regard for political subdivision or natural or historical boundary lines, may be little more than an open invitation to partisan gerrymandering." 377 U. S., at 578–579.[21] Subdivision boundaries tend to remain stable over time. Residents of political units such as townships, cities, and counties often develop a community of interest, particularly when the subdivision plays an important role in the provision of governmental services. In addition, legislative districts that do not cross subdivision boundaries are administratively convenient and less likely to confuse the voters.[22] Although the significance of deviations from sub-

---

sity, and the need to retain compactness of adjacent districts"); Adams, *supra* n. 19, at 875–876, n. 184.

In addition, geographic compactness may differ from sociopolitical compactness. Baker, *supra* n. 8, at 205. As one geographer has noted: "In many regions, the population is uneven, perhaps strung out along roads or railroads. Travel may be easier and cheaper in some directions than in others, such that an elongated district astride a major transport corridor might in fact be the most compact in the sense of minimum travel time for a representative to travel around the district. If so, then a modified criterion, the ratio of the maximum to the minimum travel time, would be a preferred measure." Morrill, *supra* n. 19, at 22.

[21] In *Kirkpatrick* v. *Preisler,* 394 U. S. 526, 534, n. 4 (1969), the Court correctly noted that adherence to subdivision boundaries could not *prevent* gerrymandering. But there it was concerned with the State's attempt to justify population disparities by a policy of adhering to existing subdivision boundaries. My discussion here is directed toward partisan gerrymandering in a scheme with relatively equipopulous districts. To the extent that dicta in *Kirkpatrick* reject the notion that respecting subdivision boundaries will not inhibit gerrymandering, I respectfully disagree. See n. 26, *infra.*

[22] Morrill, *supra* n. 19, at 25.

division boundaries will vary with the number of legislative seats and the number, size, and shape of the State's subdivisions, the number can be counted[23] and alternative plans can be compared.

A procedural standard, although obviously less precise, may also be enlightening. If the process for formulating and adopting a plan excluded divergent viewpoints, openly reflected the use of partisan criteria, and provided no explanation of the reasons for selecting one plan over another, it would seem appropriate to conclude that an adversely affected plaintiff group is entitled to have the majority explain its action.[24] On the other hand, if neutral decisionmakers developed the plan on the basis of neutral criteria, if there was an adequate opportunity for the presentation and consideration of differing points of view, and if the guidelines used in selecting a plan were explained, a strong presumption of validity should attach to whatever plan such a process produced.

Although a scheme in fact worsens the voting position of a particular group,[25] and though its geographic configuration or

---

[23] See, e. g., *Mahan* v. *Howell*, 410 U. S. 315, 319, 323 (1973); Backstrom, Robins, & Eller, *supra* n. 13, at 1145, n. 71; Morrill, *supra* n. 19, at 25. The smaller the population of a subdivision relative to the average district population, the more dubious it is to divide it among two or more districts. It is also particularly suspect to divide a particular political subdivision among more than two districts which also contain territory in other subdivisions.

[24] See, e. g., *Wright* v. *Rockefeller*, 376 U. S. 52, 73–74 (1964) (Goldberg, J., dissenting); Edwards, *supra* n. 11, at 881 (the 1961 New York congressional redistricting plan was drawn up by majority party members of a legislative committee and staff without participation by any member of the opposition party; no public hearings were held; the plan was released to the public the day before its adoption; it was approved by a straight party-line vote in a single afternoon at an extraordinary session of the legislature; and the Governor signed the bill the same day).

[25] The State may defend on the grounds that this element has not been adequately shown. For example, if the plaintiffs' challenge is based on a particular district or districts, the State may be able to show that the

genesis is sufficiently irregular to violate one or more of the criteria just discussed, it will nevertheless be constitutionally valid if the State can demonstrate that the plan as a whole embodies acceptable, neutral objectives. The same kinds of justification that the Court accepts as legitimate in the context of population disparities would also be available whenever the criteria of shape, compactness, political boundaries, or decisionmaking procedures have sent up warning flags. In order to overcome a prima facie case of invalidity, the State may adduce "legitimate considerations incident to the effectuation of a rational state policy," *Reynolds* v. *Sims*, 377 U. S., at 579, and may also

> "show with some specificity that a particular objective requires the specific deviations in its plan, rather than simply relying on general assertions. The showing . . . is flexible, depending on the size of the deviations, the importance of the State's interests, the consistency with which the plan as a whole reflects those interests, and the availability of alternatives that might substantially vindicate those interests yet approximate population equality more closely." *Ante*, at 741.[26]

If a State is unable to respond to a plaintiff's prima facie case by showing that its plan is supported by adequate neutral criteria, I believe a court could properly conclude that the challenged scheme is either totally irrational or entirely

---

group's voting strength is not diluted in the State as a whole. Even if the group's voting strength has in fact been reduced, the previous plan may have been gerrymandered in its favor. See generally Backstrom, Robins, & Eller, *supra* n. 13, at 1134–1137 (discussing possible standards of "fair representation").

[26] In determining whether the State has carried its burden of justification, I would give greater weight to the importance of the State's interests and the consistency with which those interests are served than to the size of the deviations. Thus I do not share the perspective implied in the Court's discussion of purported justifications in *Kirkpatrick* v. *Preisler*, 394 U. S., at 533–536.

motivated by a desire to curtail the political strength of the affected political group. This does not mean that federal courts should invalidate or even review every apportionment plan that may have been affected to some extent by partisan legislative maneuvering.[27] But I am convinced that the Judiciary is not powerless to provide a constitutional remedy in egregious cases.[28]

## III

In this case it is not necessary to go beyond the reasoning in the Court's opinions in *Wesberry* v. *Sanders*, 376 U. S. 1 (1964), *Kirkpatrick* v. *Preisler*, 394 U. S. 526 (1969), and

---

[27] Given the large number of potentially affected political groups, even a neutral, justifiable plan may well change the position of some groups for the worse. In addition, some "vote dilution" will inevitably result from residential patterns; see Backstrom, Robins, & Eller, *supra* n. 13, at 1127. Although the State may of course adduce this factor in defense of its plan, the criteria for a prima facie case should be demanding enough that they are not satisfied in the case of every apportionment plan. See *Mobile* v. *Bolden*, 446 U. S., at 90 (STEVENS, J., concurring in judgment) ("the standard cannot condemn every adverse impact on one or more political groups without spawning more dilution litigation than the judiciary can manage"); *id.*, at 93, n. 15 (quoting opinion of Justice Frankfurter in *Baker* v. *Carr*, 369 U. S. 186, 267 (1962)).

[28] See *Gomillion* v. *Lightfoot*, 364 U. S. 339, 341 (1960) (noting that allegations would "abundantly establish that Act 140 was not an ordinary geographic redistricting measure even within familiar abuses of gerrymandering"). If the Tuskegee map in *Gomillion* had excluded virtually all Republicans rather than blacks from the city limits, the Constitution would also have been violated. Professor Tribe gives a comparably egregious numerical hypothetical:

"For example, if a jurisdiction consisting of 540 Republicans and 460 Democrats were subdivided randomly into 10 districts, Republicans would probably be elected in six or more districts. However, if malevolent Democrats could draw district lines with precision, they might be able to isolate 100 Republicans in one district and win all the other district elections by a margin of one or two votes, thus capturing 90% of the state legislature while commanding only 46% of the popular vote." Tribe, *supra* n. 15, at 756, n. 2.

See Hacker, *supra* n. 6, at 47–50.

*White* v. *Weiser,* 412 U. S. 783 (1973), to reach the correct result. None of the additional criteria that I have mentioned would cast any doubt on the propriety of the Court's holding in this case. Although I need not decide whether the plan's shortcomings regarding shape and compactness, subdivision boundaries, and neutral decisionmaking would establish a prima facie case, these factors certainly strengthen my conclusion that the New Jersey plan violates the Equal Protection Clause.

A glance at the map, *ante,* following p. 744, shows district configurations well deserving the kind of descriptive adjectives—"uncouth"[29] and "bizarre"[30]—that have traditionally been used to describe acknowledged gerrymanders. I have not applied the mathematical measures of compactness to the New Jersey map, but I think it likely that the plan would not fare well. In addition, while disregarding geographical compactness, the redistricting scheme wantonly disregards county boundaries. For example, in the words of a commentator: "In a flight of cartographic fancy, the Legislature packed North Jersey Republicans into a new district many call 'the Swan.' Its long neck and twisted body stretch from the New York suburbs to the rural upper reaches of the Delaware River." That district, the Fifth, contains segments of at least seven counties. The same commentator described the Seventh District, comprised of parts of five counties, as tracing "a curving partisan path through industrial Elizabeth, liberal, academic Princeton and largely Jewish Marl-

---

[29] *Gomillion* v. *Lightfoot, supra,* at 339.

[30] Indeed, this very map was so described in a recent article entitled New Jersey Map Imaginative Gerrymander, appearing in the Congressional Quarterly: "New Jersey's new congressional map is a four-star gerrymander that boasts some of the most bizarrely shaped districts to be found in the nation." 40 Congressional Quarterly 1190 (1982). A quick glance at congressional districting maps for the other 49 States lends credence to this conclusion. See 1983–1984 Official Congressional Directory 989–1039 (1983).

boro in Monmouth County. The resulting monstrosity was called 'the Fishhook' by detractors." 40 Congressional Quarterly 1193–1195 (1982).[31]

Such a map prompts an inquiry into the process that led to its adoption. The plan was sponsored by the leadership in the Democratic Party, which controlled both houses of the state legislature as well as the Governor's office, and was signed into law the day before the inauguration of a Republican Governor. The legislators never formally explained the guidelines used in formulating their plan or in selecting it over other available plans. Several of the rejected plans contained districts that were more nearly equal in population, more compact, and more consistent with subdivision boundaries, including one submitted by a recognized expert, Dr. Ernest Reock, Jr., whose impartiality and academic credentials were not challenged. The District Court found that the Reock Plan "was rejected because it did not reflect the leadership's partisan concerns." *Daggett* v. *Kimmelman*, 535 F. Supp. 978, 982 (NJ 1982). This conclusion, which arises naturally from the absence of persuasive justifications for the rejection of the Reock Plan, is buttressed by a letter written to Dr. Reock by the Democratic Speaker of the New Jersey General Assembly. This letter frankly explained the importance to the Democrats of taking advantage of their opportunity to control redistricting after the 1980 census. The Speaker justified his own overt partisanship by describing the political considerations that had motivated the Republican majority in the adoption of district plans in New

---

[31] The same commentator described the Thirteenth District in this manner: "In an effort to create a 'dumping ground' for Republican votes troubling to Democrats Hughes and Howard, the Legislature established a 13th District that stretches all over the map, from the Philadelphia suburbs in Camden County to the New York suburbs in Monmouth County." 40 Congressional Quarterly, at 1198. At oral argument, we observed the likeness between the boundaries of yet another district—the Fourth—and the shape of a running back. Tr. of Oral Arg. 21.

Jersey in the past—and in other States at the present.[32]    In sum, the record indicates that the decisionmaking process leading to adoption of the challenged plan was far from neutral.    It was designed to increase the number of Democrats, and to decrease the number of Republicans, that New Jersey's voters would send to Congress in future years.[33] Finally, the record does not show any legitimate justifications for the irregularities in the New Jersey plan, although concededly the case was tried on a different theory in the District Court.

Because I have not made a comparative study of other districting plans, and because the State has not had the opportu-

---

[32] "Congressional redistricting in New Jersey must also be viewed from the more broad-based national perspective.    The Republican party is only 27 votes short of absolute control of Congress.    With a shift of population and consequently Congressional seats from the traditionally Democratic urban industrial states to the more Republican dominated sun-belt states the redistricting process is viewed by Republicans as an opportunity to close that 27 vote margin, or perhaps even overcome it entirely."    535 F. Supp., at 991.

Copies of the letter were sent to all Democratic legislators.

[33] Although Circuit Judge Gibbons disagreed with the holding of the District Court in this case, the concluding paragraphs of his dissenting opinion unambiguously imply that he would have no difficulty identifying this as a case in which the district lines were drawn in order to disadvantage an identifiable political group.    He wrote:

"The apportionment map produced by P. L. 1982, c.1 leaves me, as a citizen of New Jersey, disturbed.    It creates several districts which are anything but compact, and at least one district which is contiguous only for yachtsmen.    While municipal boundaries have been maintained, there has been little effort to create districts having a community of interests.    In some districts, for example, different television and radio stations, different newspapers, and different transportation systems serve the northern and southern localities.    Moreover the harshly partisan tone of Speaker Christopher Jackman's letter to Ernest C. Reock, Jr. is disedifying, to say the least.    It is plain, as well, that partisanship produced artificial bulges or appendages of two districts so as to place the residences of Congressmen Smith and Courter in districts where they would be running against incumbents."    *Id.*, at 984.

nity to offer justifications specifically directed toward the additional concerns I have discussed, I cannot conclude with absolute certainty that the New Jersey plan was an unconstitutional partisan gerrymander. But I am in full agreement with the Court's holding that, because the plan embodies deviations from population equality that have not been justified by any neutral state objective, it cannot stand. Further, if population equality provides the only check on political gerrymandering, it would be virtually impossible to fashion a fair and effective remedy in a case like this. For if the shape of legislative districts is entirely unconstrained, the dominant majority could no doubt respond to an unfavorable judgment by providing an even more grotesque-appearing map that reflects acceptable numerical equality with even greater political inequality. If federal judges can prevent that consequence by taking a hard look at the shape of things to come in the remedy hearing, I believe they can also scrutinize the original map with sufficient care to determine whether distortions have any rational basis in neutral criteria. Otherwise, the promise of *Baker* v. *Carr* and *Reynolds* v. *Sims*—that judicially manageable standards can assure "[f]ull and effective participation by all citizens," 377 U. S., at 565—may never be fulfilled.

JUSTICE WHITE, with whom THE CHIEF JUSTICE, JUSTICE POWELL, and JUSTICE REHNQUIST join, dissenting.

This case concerns the congressional reapportionment of New Jersey. The districting plan enacted by the New Jersey Legislature and signed into law by the Governor on January 19, 1982, Pub. L. 1982, ch. 1, reduced the number of congressional districts in the State from 15 to 14 as required by the 1980 census figures. The 14 congressional districts created by the legislature have an average deviation of 0.1384% and a maximum deviation between the largest and smallest districts of 0.6984%. In other words, this case concerns a

maximum difference of 3,674 individuals in districts encompassing more than a half million people. The New Jersey plan was invalidated by a divided District Court because these population variances were not "'unavoidable despite a good-faith effort to achieve absolute equality.'" *Daggett* v. *Kimmelman*, 535 F. Supp. 978, 982 (NJ 1982), quoting *Kirkpatrick* v. *Preisler*, 394 U. S. 526, 531 (1969). Today, the Court affirms the District Court's decision thereby striking for the first time in the Court's experience a legislative or congressional districting plan with an average and maximum population variance of under 1%.

I respectfully dissent from the Court's unreasonable insistence on an unattainable perfection in the equalizing of congressional districts. The Court's decision today is not compelled by *Kirkpatrick* v. *Preisler, supra,* and *White* v. *Weiser,* 412 U. S. 783 (1973), see Part I, *infra,* and if the Court is convinced that our cases demand the result reached today, the time has arrived to reconsider these precedents. In any event, an affirmance of the decision below is inconsistent with the majority's own "modifications" of *Kirkpatrick* and *White* which require, at a minimum, further consideration of this case by the District Court. See Part IV, *infra.*

## I

"[T]he achieving of fair and effective representation for all citizens is concededly the basic aim of legislative apportionment." *Reynolds* v. *Sims,* 377 U. S. 533, 565–566 (1964). One must suspend credulity to believe that the Court's draconian response to a trifling 0.6984% maximum deviation promotes "fair and effective representation" for the people of New Jersey. The requirement that "as nearly as is practicable one man's vote in a congressional election is to be worth as much as another's," *Wesberry* v. *Sanders,* 376 U. S. 1, 7–8 (1964), must be understood in light of the malapportionment in the States at the time *Wesberry* was decided. The plaintiffs in *Wesberry* were voters in a congressional district (population 823,680) encompassing Atlanta that was three

times larger than Georgia's smallest district (272,154) and more than double the size of an average district. Because the State had not reapportioned for 30 years, the Atlanta District possessing one-fifth of Georgia's population had only one-tenth of the Congressmen. Georgia was not atypical; congressional districts throughout the country had not been redrawn for decades and deviations of over 50% were the rule.[1] These substantial differences in district size diminished, in a real sense, the representativeness of congressional elections. The Court's invalidation of these profoundly unequal districts should not be read as a demand for precise mathematical equality between the districts. Indeed, the Court sensibly observed that "it may not be possible [for the States] to draw congressional districts with mathematical precision." *Id.*, at 18. In *Reynolds* v. *Sims, supra*, at 577, decided the same Term, the Court disavowed a requirement of mathematical exactness for legislative districts in even more explicit terms:

> "We realize that it is a practical impossibility to arrange legislative districts so that each one has an identical number of residents, or citizens, or voters. Mathematical exactness or precision is hardly a workable constitutional requirement."

The States responded to *Wesberry* by eliminating gross disparities between congressional districts. Nevertheless, redistricting plans with far smaller variations were struck by the Court five years later in *Kirkpatrick* v. *Preisler, supra*, and its companion, *Wells* v. *Rockefeller*, 394 U. S. 542 (1969). The redistricting statutes before the Court contained total percentage deviations of 5.97% and 13.1%, respectively.

---

[1] By 1962, 35 out of 42 States had variances among their districts of over 100,000. *Wesberry* v. *Sanders*, 376 U. S. 1, 20–21 (1964) (Harlan, J. dissenting). The Court has recognized the significance of the fact that "enormous variations" in district size were at issue in the early legislative apportionment cases. *Gaffney* v. *Cummings*, 412 U. S. 735, 744, and n. 9 (1973).

But *Wesberry*'s "as nearly as practicable" standard was read to require "a good-faith effort to achieve precise numerical equality." 394 U. S., at 530–531. Over the objections of four Justices, see *id.*, at 536 (Fortas, J., concurring); *id.*, at 549 (Harlan, J., joined by Stewart, J., dissenting); *id.*, at 553 (WHITE, J., dissenting), *Kirkpatrick* rejected the argument that there is a fixed numerical or percentage population variance small enough to be considered *de minimis* and to satisfy the "as nearly as practicable" standard. *Kirkpatrick*'s rule was applied by the Court in *White* v. *Weiser, supra,* to invalidate Texas' redistricting scheme which had a maximum population variance of 4.13%.

Just as *Wesberry* did not require *Kirkpatrick, Kirkpatrick* does not ineluctably lead to the Court's decision today. Although the Court stated that it could see "no nonarbitrary way" to pick a *de minimis* point, the maximum deviation in *Kirkpatrick,* while small, was more than eight times as large as that posed here. Moreover, the deviation in *Kirkpatrick* was not argued to fall within the officially accepted range of statistical imprecision of the census. Interestingly enough, the Missouri redistricting plan approved after *Kirkpatrick* contained a deviation of 0.629%—virtually the same deviation declared unconstitutional in this case. *Preisler* v. *Secretary of State of Missouri,* 341 F. Supp. 1158, 1162 (WD Mo.), summarily aff'd *sub nom. Danforth* v. *Preisler,* 407 U. S. 901 (1972).[2] Accordingly, I do not view the Court's decision today as foreordained by *Kirkpatrick* and *Weiser.* Apparently neither did JUSTICE BRENNAN who, in staying the District Court's order, wrote:

"The appeal would thus appear to present the important question whether *Kirkpatrick* v. *Preisler* requires adoption of the plan that achieves the most precise math-

---

[2] District Courts have upheld or selected plans with similar deviations. See, *e. g., Doulin* v. *White,* 535 F. Supp. 450, 451 (ED Ark. 1982) (court ordered implementation of plan with 0.78% deviation despite alternative plan with deviation of 0.13%).

ematical exactitude, or whether *Kirkpatrick* left some latitude for the New Jersey Legislature to recognize the considerations taken into account by it as a basis for choosing among several plans, each with arguably 'statistically insignificant' variances from the constitutional ideal of absolute precision." 455 U. S. 1303, 1305 (1982).

There can be little question but that the variances in the New Jersey plan are "statistically insignificant." Although the Government strives to make the decennial census as accurate as humanly possible, the Census Bureau has never intimated that the results are a perfect count of the American population. The Bureau itself estimates the inexactitude in the taking of the 1970 census at 2.3%,[3] a figure which is considerably larger than the 0.6984% maximum variance in the New Jersey plan, and which dwarfs the 0.2470% difference between the maximum deviations of the selected plan and the leading alternative plan, that suggested by Professor Reock. Because the amount of undercounting differs from district to district, there is no point for a court of law to act under an unproved assumption that such tiny differences between redistricting plans reflect actual differences in population. As Dr. James Trussel, an expert in these matters, and whose testimony the Court purports to accept, *ante,* at 735–736, explained:

"The distribution of the undercount in New Jersey is obviously also unknown, and I see no reason to believe that

[3] U. S. Bureau of the Census, Users' Guide, 1980 Census of Population and Housing 100 (Mar. 1982). The National Academy of Sciences has estimated that the national undercount in the 1970 census was 2.5%. Panel on Decennial Census Plans, Counting the People in 1980: An Appraisal of Census Plans 2 (1978). One estimate is that the undercount error in the 1980 census is likely to be more than 2 million people nationwide, App. 103 (Dr. Trussel), and may be as high as 5 million. J. Passel, J. Siegel, & J. Robinson, Coverage of the National Population in the 1980 Census, by Age, Sex, and Race: Preliminary Estimates by Demographic Analysis (Nov. 1981) (Record Doc. No. 31).

it would be uniformly spread over all municipalities. For these reasons, one cannot make congressional districts of truly equal size if one relies on census counts. Nor is it meaningful to rank one redistricting plan as superior to another when differences in district size are small. In my professional opinion, districts whose enumerated populations differ one from another by less than one percent should be considered to be equal in size. To push for numerical equality beyond this point is an exercise in illusion." App. 103–104.[4]

---

[4] The Court, after professing to "[a]ssum[e] for purposes of argument that each of [Dr. Trussel's] statements is correct," *ante,* at 735–736, proceeds in the following paragraph to denigrate his calculation as guesswork because the margin of statistical imprecision, *i. e.,* the undercounting of persons, cannot be known precisely. The failure to quantify uncertainty exactly does not excuse pretending that it does not exist. When the question is whether the range of error is 1% or 2% or 2.5% and the deviation at hand is no larger than 0.6984%, the question is more academic than practical. Moreover, if a fixed benchmark were required, the margin of error officially recognized by the Census Bureau—last estimated at 2.3%—could easily be selected.

The Court also makes much of the fact that the precise amount of variation in undercounting among districts cannot be known with certainty. The relevant point, however, is that these district-to-district variances make it impossible to determine with statistical confidence whether opting for the plan with the smallest maximum deviation is ameliorating or aggravating actual equality of population among the districts. In addition, the count of individuals per district depends upon the Census Bureau's selection of geographic boundaries by which to group data. "Data from the 1980 census have been compiled for congressional districts by equating component census geographic areas to each district and summing all data for areas coded to the district. Where the smallest census geographic area was split by a congressional district boundary, the census maps for the area were reviewed to determine in which district the majority of the population fell, and the entire area was coded to that district." U. S. Bureau of Census, Congressional Districts of the 98th Congress A–1 (1983) (preliminary draft). Thus, completely aside from undercounting effects, it is obvious that even absolute numerical equality between the census figures for congressional districts does not reflect districts of equal size.

Even if the 0.6984% deviation here is not encompassed within the scope of the statistical imprecision of the census, it is miniscule when compared with other variations among the districts inherent in translating census numbers into citizens' votes. First, the census "is more of an event than a process." *Gaffney* v. *Cummings*, 412 U. S. 735, 746 (1973). "It measures population at only a single instant in time. District populations are constantly changing, often at different rates in either direction, up or down." *Ibid.* As the Court admits, "the well-known restlessness of the American people means that population counts for particular localities are outdated long before they are completed." *Ante*, at 732.[5] Second, far larger differences among districts are introduced because a substantial percentage of the total population is too

Finally, the Court dismisses the entire concept of statistical error with the sophistic comment that "[e]ven if one cannot say with certainty that one district is larger than another merely because it has a higher census count, one *can* say with certainty that the district with a larger census count is more likely to be larger than the other district than it is to be smaller or the same size." *Ante*, at 738. The degree of that certainty, however, is speculative. The relevant consideration is not whether District Four is larger than District Six, but how much larger, and, how much less larger under the selected plan vis-à-vis an alternative plan. Moreover, variable undercounting and differences between census units and district lines may result in other districts having higher maximum deviations.

The general point is that when the numbers become so small, it makes no sense to concentrate on ever finer gradations when one cannot even be certain whether doing so increases or decreases actual population variances.

[5] In New Jersey, for example, population growth during the 1970's enlarged some districts by up to 26%, while other congressional districts lost up to 8.7% of their 1970 population. U. S. Bureau of Census, Congressional Districts of the 98th Congress 32–3 (1983). See also *Gaffney* v. *Cummings*, 412 U. S., at 746, n. 11.

JUSTICE STEVENS makes the same point.

"Given the birth rate, the mortality rate, the transient character of modern society, and the acknowledged errors in the census, we all know that such differences may vanish between the date of the census and the date of the next election. Absolute population equality is impossible to achieve." *Ante*, at 752 (concurring opinion).

young to register or is disqualified by alienage.[6]   Third, census figures cannot account for the proportion of all those otherwise eligible individuals who fail to register.[7]   The differences in the number of eligible voters per district for these reasons overwhelm the minimal variations attributable to the districting plan itself.[8]

Accepting that the census, and the districting plans which are based upon it, cannot be perfect represents no backsliding in our commitment to assuring fair and equal representation in the election of Congress.   I agree with the views of Judge Gibbons, who dissented in the District Court, that *Kirkpatrick* should not be read as a "prohibition against toleration of *de minimis* population variances which have no statistically relevant effect on relative representation." *Daggett* v. *Kimmelman*, 535 F. Supp., at 984.   A plus-minus deviation of 0.6984% surely falls within this category.

If today's decision simply produced an unjustified standard with little practical import, it would be bad enough.   Unfortunately, I fear that the Court's insistence that "there are no *de minimis* population variations, which could practicably be avoided, but which nonetheless meet the standard of Art. I, § 2, without justification," *ante*, at 734, invites further litigation of virtually every congressional redistricting plan in

---

[6] In New Jersey, for example, the population 18 years old and over differs significantly among the congressional districts.   In 1978, District 10 had but 282,000 such individuals, while District 2 had 429,000.   U. S. Bureau of Census, State and Metropolitan Area Data Book 549 (1979). See also *Gaffney* v. *Cummings, supra*, at 747, n. 13.

[7] Throughout the Nation, approximately 71% of the voting age population registers to vote.   U. S. Bureau of Census, State and Metropolitan Area Data Book 567 (1982).

[8] As a result of all these factors, as well as the failure of many registered voters to cast ballots, the weight of a citizen's vote in one district is inevitably different from that in others.   For example, the total number of votes cast in the 1982 New Jersey congressional races differed significantly between districts, ranging from 92,852 in District 10 to 186,879 in District 9.   41 Congressional Quarterly 391 (1983).

the Nation. At least 12 States which have completed re-districting on the basis of the 1980 census have adopted plans with a higher deviation than that presented here, and 4 others have deviations quite similar to New Jersey's.[9] Of course, under the Court's rationale, even Rhode Island's plan—whose two districts have a deviation of 0.02% or about 95 people—would be subject to constitutional attack.

In all such cases, state legislatures will be hard pressed to justify their preference for the selected plan. A good-faith effort to achieve population equality is not enough if the population variances are not "unavoidable." The court must consider whether the population differences could have been further "reduced or eliminated altogether." *Ante*, at 730. With the assistance of computers, there will generally be a plan with an even more minimal deviation from the mathematical ideal. Then, "the State must bear the burden of proving that each significant variance between districts was necessary to achieve some legitimate goal." *Ante*, at 731. As this case illustrates, literally any variance between districts will be considered "significant."[10] The State's burden will not be easily met: "the State bears the burden of justifying

---

[9] States with larger deviations are Indiana (2.96%); Alabama (2.45%); Tennessee (2.40%); Georgia (2.00%); Virginia (1.81%); North Carolina (1.76%); New York (1.64%); Kentucky (1.39%); Washington (1.30%); Massachusetts (1.09%); New Mexico (0.87%); Arkansas (0.78%). States with similar maximum deviations are Ohio (0.68%); Nevada (0.60%); Oklahoma (0.58%); West Virginia (0.49%). Council of State Governments & National Conference of State Legislatures, 1 Reapportionment Information Update 6–7 (Nov. 12, 1982).

[10] The Court's language suggests that not only must the maximum variance in a plan be supported, but that also every deviation from absolute equality must be so justified. *Ante*, at 740. Consider the staggering nature of the burden imposed: Each population difference between any two districts in a State must be justified, apparently even if none of the plans before the legislature or commission would have reduced the difference. See n. 11, *infra*.

the differences with particularity." *Ante*, at 739. When the State fails to sustain its burden, the result will generally be that a court must select an alternative plan. The choice will often be disputed until the very eve of an election, see, *e. g.*, *Upham* v. *Seamon*, 456 U. S. 37, 44 (1982) *(per curiam)*, leaving candidates and voters in a state of confusion.

The only way a legislature or bipartisan commission can hope to avoid litigation will be to dismiss all other legitimate concerns and opt automatically for the districting plan with the smallest deviation.[11] Yet no one can seriously contend that such an inflexible insistence upon mathematical exactness will serve to promote "fair and effective representation." The more likely result of today's extension of *Kirkpatrick* is to move closer to fulfilling Justice Fortas' prophecy that "a legislature might have to ignore the boundaries of common sense, running the congressional district line down the middle of the corridor of an apartment house or even dividing the residents of a single-family house between two districts." 394 U. S., at 538. Such sterile and mechanistic application only brings the principle of "one man, one vote" into disrepute.

## II

One might expect the Court had strong reasons to force this Sisyphean task upon the States. Yet the Court offers

---

[11] Even by choosing the plan with the smallest deviation, a legislature or commission cannot be assured of avoiding constitutional challenge. In this case the Court does not find that the 0.6984% deviation was avoidable because there were other plans before the New Jersey Legislature with smaller maximum variations. Nor does the Court counter appellants' position, supported by evidence in the record, that these alternative plans had other disqualifying faults. Instead, the Court tries its own hand at redistricting New Jersey and concludes that by moving around 13 New Jersey subdivisions, the maximum deviation could be reduced to 0.449%. *Ante*, at 739–740, n. 10. The message for state legislatures is clear: it is not enough that the chosen plan be superior to any actual plans introduced as alternatives, the plan must also be better than any conceivable alternative a federal judge can devise.

no positive virtues that will follow from its decision. No pretense is made that this case follows in the path of *Reynolds* and *Wesberry* in insuring the "fair and effective representation" of citizens. No effort is expended to show that Art. I, § 2's requirement that Congressmen be elected "by the people," *Wesberry* v. *Sanders*, 376 U. S. 1 (1964), demands the invalidation of population deviations at this level. Any such absolute requirement, if it did exist, would be irreconcilable with the Court's recognition of certain justifications for population variances. See *ante*, at 740. Given no express constitutional basis for the Court's holding, and no showing that the objectives of fair representation are compromised by these minimal disparities, the normal course would be to uphold the actions of the legislature in fulfilling its constitutionally delegated responsibility to prescribe the manner of holding elections for Senators and Representatives. Art. I, § 4. Doing so would be in keeping with the Court's oft-expressed recognition that apportionment is primarily a matter for legislative judgment. *Upham* v. *Seamon, supra,* at 41; *White* v. *Weiser,* 412 U. S., at 795; *Reynolds* v. *Sims,* 377 U. S., at 586. "[A] state legislature is the institution that is by far the best situated to identify and then reconcile traditional state policies within the constitutionally mandated framework . . . ." *Connor* v. *Finch,* 431 U. S. 407, 414–415 (1977).

Instead the Court is purely defensive in support of its decision. The Court refuses to adopt any fixed numerical standard, below which the federal courts would not intervene, asserting that "[t]he principle of population equality for congressional districts has not proved unjust or socially or economically harmful in experience." *Ante,* at 733. Of course, the *principle* of population equality is not unjust; the unreasonable *application* of this principle is the rub. Leaving aside that the principle has never been applied with the vengeance witnessed today, there are many, including myself, who take issue with the Court's self-congratulatory assumption that *Kirkpatrick* has been a success. First, a

decade of experience with *Kirkpatrick* has shown that "the rule of absolute equality is perfectly compatible with 'gerrymandering' of the worst sort." *Wells* v. *Rockefeller*, 394 U. S., at 551 (Harlan, J., dissenting). With ever more sophisticated computers, legislators can draw countless plans for absolute population equality, but each having its own political ramifications. Although neither a rule of absolute equality nor one of substantial equality can alone prevent deliberate partisan gerrymandering, the former offers legislators a ready justification for disregarding geographical and political boundaries. I remain convinced of what I said in dissent in *Kirkpatrick* and *Wells:* "[Those] decisions . . . downgrade a restraint on a far greater potential threat to equality of representation, the gerrymander. Legislatures intent on minimizing the representation of selected political or racial groups are invited to ignore political boundaries and compact districts so long as they adhere to population equality among districts using standards which we know and they know are sometimes quite incorrect." 349 U. S., at 555. There is now evidence that Justice Harlan was correct to predict that "[e]ven more than in the past, district lines are likely to be drawn to maximize the political advantage of the party temporarily dominant in public affairs." *Id.*, at 552.[12]

---

[12] Unlike population deviations, political gerrymandering does not lend itself to arithmetic proof. Nevertheless, after reviewing the recent redistricting throughout the country, one commentator offered the following assessment:

"The nobly aimed 'one-man, one-vote' principle is coming into increasing use as a weapon for state legislators bent on partisan gerrymandering. From California to New Jersey and points in between, Republicans and Democrats alike are justifying highly partisan remaps by demonstrating respect for the 1964 Supreme Court mandate that population of congressional districts within states must be made as equal as possible. Meanwhile, other interests at stake in redistricting—such as the preservation of community boundaries and the grouping of constituencies with similar concerns—are being brushed aside . . . . The emphasis on one-man, one-vote not only permits gerrymandering, it encourages it. In many states it is

In addition to providing a patina of respectability for the equipopulous gerrymander, *Kirkpatrick*'s regime assured extensive intrusion of the judiciary into legislative business.

impossible to approach population equality without crossing city, county and township lines. Once the legislature recognizes that move must be made, it is only a short step further to the drawing of a line that dances jaggedly through every region of the state. Local interests, informed that it is no longer legally permissible to draw a whole-county congressional map in most states, are far less likely to object than they were in the past . . . . The court's decision to reject a tiny deviation in favor of an even smaller one may further encourage the hairsplitting numbers game that has given rise to partisan gerrymanders all over the country." Congressional Quarterly, Inc., State Politics and Redistricting 1–2 (1982).

See also Engstrom, The Supreme Court and Equipopulous Gerrymandering: A Remaining Obstacle in the Quest for Fair and Effective Representation, 1976 Ariz. State L. J. 277, 278 ("Not only has the Court failed to develop effective checks on the practice of gerrymandering, but in pursuing the goal of population equality to a point of satiety it has actually facilitated that practice"); Baker, One Man, One Vote, and "Political Fairness," 23 Emory L. J. 701, 710 (1974) (hereafter Baker) ("Priority was typically given to miniscule population variations at the expense of any recognition of political subdivisions. Charges of partisan gerrymandering were more widespread than in past decades for two major reasons: the extent of redistricting activity among all fifty states, and the lack of emphasis on former norms of compactness and adherence to local boundary lines").

In the eyes of some commentators, the experience of New York in the aftermath of *Wells* v. *Rockefeller* is instructive.

"Subsequent congressional districting in New York became a possible prototype for the 'equal-population gerrymander.' Whereas the former district pattern nullified by the Supreme Court had been the result of bipartisan compromise with each major party controlling one house, by 1970 the Republicans held both legislative houses as well as the governorship. The assistant counsel to the senate majority leader (and chief coordinator of the redistricting) candidly remarked: 'The Supreme Court is just making gerrymandering easier than it used to be.' Not only was New York City subjected to major cartographic surgery, but upstate cities were also fragmented, with portions being joined to suburban and rural areas in an attempt to dilute concentrations of Democrats." Baker, at 712–713.

Yet, under the new plan, no district deviated by more than than 490 persons from the average, and the configuration of district boundaries revealed generally compact and contiguous contours. Baker, Gerrymander-

"[T]he [re]apportionment task, dealing as it must with fundamental 'choices about the nature of representation,' *Burns* v. *Richardson*, 384 U. S., at 92, is primarily a political and legislative process." *Gaffney* v. *Cummings*, 412 U. S., at 749. What we said in *Gaffney* with respect to legislative reapportionment is apropos here:

> "[T]he goal of fair and effective representation [is not] furthered by making the standards of reapportionment so difficult to satisfy that the reapportionment task is recurringly removed from legislative hands and performed by federal courts which themselves must make the political decisions necessary to formulate a plan or accept those made by reapportionment plaintiffs who may have wholly different goals from those embodied in the official plan." *Ibid.*

More than a decade's experience with *Kirkpatrick* demonstrates that insistence on precise numerical equality only invites those who lost in the political arena to refight their battles in federal court. Consequently, "[m]ost estimates are that between 25 percent and 35 percent of current house district lines were drawn by the Courts." American Bar Association, Congressional Redistricting 20 (1981). As I have already noted, by extending *Kirkpatrick* to deviations below even the 1% level, the redistricting plan in every State with more than a single Representative is rendered vulnerable to after-the-fact attack by anyone with a complaint and a calculator.

The Court ultimately seeks refuge in *stare decisis*. I do not slight the respect that doctrine is due, see, *e. g.*, *White* v.

---

ing: Privileged Sanctuary or Next Judicial Target?, in Reapportionment in the 1970s, p. 138 (N. Polsby ed. 1971). Ironically, David Wells, the plaintiff who successfully challenged the former district pattern, returned to federal court in February 1970 to ask if the old plan could be restored. See Dixon, "One Man, One Vote—What Happens Next?," 60 Nat. Civic Rev. 259, 265 (1971).

*Weiser*, 412 U. S. 783 (1973), but is it not at least ironic to find *stare decisis* invoked to protect *Kirkpatrick* as the Court itself proceeds to overrule other holdings in that very decision? In *Kirkpatrick*, the Court squarely rejected the argument that slight variances in district size were proper in order to avoid fragmenting political subdivisions:

> "[W]e do not find legally acceptable the argument that variances are justified if they necessarily result from a State's attempt to avoid fragmenting political subdivisions by drawing congressional district lines along existing county, municipal, or other political subdivision boundaries." 394 U. S., at 533–534.[13]

Several pages later, the Court rejected in equally uncategorical terms the idea that variances may be justified in order to make districts more compact. *Id.*, at 535–536. "A State's preference for pleasingly shaped districts," the Court concluded, "can hardly justify population variances." *Id.*, at 536. In Justice Fortas' words, the *Kirkpatrick* Court "reject[s], *seriatim*, every type of justification that has been— possibly, every one that could be—advanced." *Id.*, at 537.

Yet today the Court—with no mention of the contrary holdings in *Kirkpatrick*—opines: "Any number of consistently applied legislative policies might justify some variance, including for instance, making districts compact, respecting municipal boundaries, preserving the cores of prior districts, and avoiding contests between incumbent Representatives."

---

[13] See also *Mahan* v. *Howell*, 410 U. S. 315, 341 (1973) (BRENNAN, J., concurring in part and dissenting in part) ("What our decisions have made clear is that certain state interests that are pertinent to legislative reapportionment can have no possible relevance to congressional districting. Thus, the need to preserve the integrity of political subdivisions as political subdivisions may, in some instances, justify small variations in the population of districts from which state legislators are elected. But that interest can hardly be asserted in justification of malapportioned congressional districts. *Kirkpatrick* v. *Preisler, supra*").

*Ante,* at 740. I, of course, welcome the Court's overruling of these ill-considered holdings of *Kirkpatrick.* There should be no question but that state legislatures may account for political and geographic boundaries in order to preserve traditional subdivisions and achieve compact and contiguous districts. JUSTICE STEVENS recognizes that courts should "give greater weight to the importance of the State's interests and the consistency with which those interests are served than to the size of the deviations." *Ante,* at 760, n. 26. Thus, a majority of the Court appears ready to apply this new standard "with a strong measure of deference to the legitimate concerns of the State." *Post,* at 785, n. 1 (POWELL, J., dissenting).

In order that legislatures have room to accommodate these legitimate noncensus factors, a range of *de minimis* population deviation, like that permitted in the legislative reapportionment cases, is required. The Court's insistence that every deviation, no matter how small, be justified with specificity discourages legislatures from considering these "legitimate" factors in making their plans, lest the justification be found wanting, the plan invalidated, and a judicially drawn substitute put in its place. Moreover, the requirement of precise mathematical equality continues to invite those who would bury their political opposition to employ equipopulous gerrymanders. A *de minimis* range would not preclude such gerrymanders but would at least force the political cartographer to justify his work on its own terms.

## III

Our cases dealing with state legislative apportionment have taken a more sensible approach. We have recognized that certain small deviations do not, in themselves, ordinarily constitute a prima facie constitutional violation. *Gaffney* v. *Cummings,* 412 U. S. 735 (1973); *White* v. *Regester,* 412 U. S. 755 (1973). Moreover, we have upheld plans with reasonable variances that were necessary to account for political

subdivisions, *Mahan* v. *Howell*, 410 U. S. 315 (1973), to preserve the voting strength of minority groups, and to insure political fairness, *Gaffney* v. *Cummings, supra.* What we held in *Gaffney* v. *Cummings* for legislative apportionment is fully applicable to congressional redistricting:

> " '[T]he achieving of fair and effective representation for all citizens is' . . . a vital and worthy goal, but surely its attainment does not in any commonsense way depend upon eliminating the insignificant population variations involved in this case. Fair and effective representation may be destroyed by gross population variations among districts, but it is apparent that such representation does not depend solely on mathematical equality among district populations . . . . An unrealistic overemphasis on raw population figures, a mere nose count in the districts, may submerge these other considerations and itself furnish a ready tool for ignoring factors that in day-to-day operation are important to an acceptable representation and apportionment arrangement." 412 U.S., at 748–749.

Bringing together our state legislative and congressional cases does not imply overlooking relevant differences between the two. States normally draw a larger number of legislative districts, which accordingly require a greater margin to account for geographical and political boundaries. "[C]ongressional districts are not so intertwined and freighted with strictly local interests as are state legislative districts." *White* v. *Weiser*, 412 U. S., at 793. Furthermore, because congressional districts are generally much larger than state legislative districts, each percentage point of variation represents a commensurately greater number of people. But these are differences of degree. They suggest that the level at which courts should entertain challenges to districting plans, absent unusual circumstances, should be lower in the

congressional cases, but not altogether nonexistent.[14] Although I am not wedded to a precise figure, in light of the current range of population deviations, a 5% cutoff appears reasonable. I would not entertain judicial challenges, absent extraordinary circumstances, where the maximum deviation is less than 5%. Somewhat greater deviations, if rationally related to an important state interest, may also be permissible.[15] Certainly, the maintaining of compact, contiguous districts, the respecting of political subdivisions, and efforts to assure political fairness, e. g., *Gaffney* v. *Cummings, supra*, constitute such interests.

I would not hold up New Jersey's plan as a model reflection of such interests. Nevertheless, the deviation involved here is *de minimis*, and, regardless of what other infirmities the

---

[14] As the law has developed, our congressional cases are rooted in Art I, § 2, of the Constitution while our legislative cases rely upon the Equal Protection Clause of the Fourteenth Amendment. I am not aware, however, of anything in the respective provisions which justifies, let alone requires, the difference in treatment that has emerged between the two lines of decisions. Our early cases were frequently cross-cited, and the formulation "as nearly of equal population as is practicable" appears in *Reynolds* v. *Sims*, 377 U. S., at 589, as well as in *Wesberry* v. *Sanders*, 376 U. S., at 7–8. The differing paths the cases have taken since *Kirkpatrick* must result from that decision's rejection of the legitimacy of considering nonpopulation factors in congressional redistricting. See *Mahan* v. *Howell*, 410 U. S., at 341 (BRENNAN, J., concurring in part and dissenting in part). With today's long-awaited overruling of that holding in *Kirkpatrick*, any remaining justification disappears for such a marked difference in our approach to congressional and legislative reapportionment.

[15] Experience in the legislative apportionment field following our allowance of a range of *de minimis* variance is convincing proof that we need not fear that the goal of equal population in the districts will receive less than its due. JUSTICE BRENNAN's prediction that tolerating *de minimis* population variances would "jeopardize the very substantial gains" made in equalizing legislative districts, *White* v. *Regester*, 412 U. S. 755, 781 (1973) (concurring in part and dissenting in part), has not been proved, and, indeed, the prediction is refuted by an analysis of the legislative redistricting undertaken after the 1980 census. See Council of State Governments & National Conference of State Legislatures, 1 Reapportionment Information Update 6 (Nov. 12, 1982).

plan may have, constitutional or otherwise, there is no violation of Art. I, § 2—the sole issue before us. It would, of course, be a different matter if appellees could demonstrate that New Jersey's plan invidiously discriminated against a racial or political group. See *White* v. *Regester, supra; Gaffney* v. *Cummings, supra,* at 751–754; *Whitcomb* v. *Chavis,* 403 U. S. 124 (1971); *Gomillion* v. *Lightfoot,* 364 U. S. 339 (1960).

## IV

Even if the Court's view of the law were correct, its disposition of the case is not. At a minimum, the Court should vacate the decision of the District Court and remand for further consideration. As previously indicated, the Court finally recognizes today that considerations such as respecting political subdivisions and avoiding contests between incumbent Representatives might justify small population variances. Indeed, the Court indicates that "any number of consistently applied legislative policies" might do so. *Ante,* at 740. There is evidence in the record to suggest that the New Jersey Legislature was concerned with such considerations.[16] The Court itself notes: "many of the problems that the New Jersey Legislature encountered in drawing districts with equal population stemmed from the decision . . . not to divide any municipalities between two congressional districts." *Ante,* at 733, n. 5. But even if there were no evidence in the record, the State should be given a chance to defend its plan on this basis. Surely, the Court cannot rely on the fact that appellants have advanced only one justification for the plan's population deviations—preserving the voting strength of racial minority groups. Relying on *Kirkpatrick* and *White* v. *Weiser, supra,* appellants no doubt concluded that other justifications were foreclosed and that the introduction of such proof would be futile.

---

[16] See, *e. g.,* Feldman Deposition, at 91–94 (Record Doc. No. 39) (concern with fairness to incumbents); Jackman Deposition, at 91–92 (Record Doc. No. 40) (concern with preserving political subdivisions).

JUSTICE POWELL, dissenting.

I join JUSTICE WHITE's excellent dissenting opinion, and reaffirm my previously expressed doubt that "the Constitution—a vital and living charter after nearly two centuries because of the wise flexibility of its key provisions—could be read to require a rule of mathematical exactitude in legislative reapportionment." *White* v. *Weiser*, 412 U. S. 783, 798 (1973) (concurring opinion). I write separately to express some additional thoughts on gerrymandering and its relation to apportionment factors that presumably were not thought relevant under *Kirkpatrick* v. *Preisler*, 394 U. S. 526 (1969).

## I

The Court, following *Kirkpatrick*, today invalidates New Jersey's redistricting plan solely because various alternative plans, principally the one proposed by Professor Reock, had what the Court views as "appreciably smaller population deviations between the largest and smallest districts." *Ante*, at 728. Under all of the plans, the maximum population variances were under 1%. I view these differences as neither "appreciable" nor constitutionally significant. As JUSTICE WHITE demonstrates, *ante*, at 769–772 (dissenting opinion), the Court's insistence on precise mathematical equality is self-deluding, given the inherent inaccuracies of the census data and the other difficulties in measuring the voting population of a district that will exist for a period of 10 years. See *Kirkpatrick*, *supra*, at 538 (Fortas, J., concurring) (pursuit of precise equality "is a search for a will-o'-the-wisp"). Moreover, it has become clear that *Kirkpatrick* leaves no room for proper legislative consideration of other factors, such as preservation of political and geographic boundaries, that plainly are relevant to rational reapportionment decisions,[1] see *Gaffney*

---

[1] The Court holds that "[a]ny number of consistently applied legislative policies might justify some variance, including, for instance, making districts compact, respecting municipal boundaries, preserving the cores of

v. *Cummings*, 412 U. S. 735, 749 (1973); *Mahan* v. *Howell*, 410 U. S. 315, 329 (1973). As JUSTICE WHITE correctly observes, *ante*, at 775–776, a decade of experience has confirmed the fears of the *Kirkpatrick* dissenters that an uncompromising emphasis on numerical equality would serve to encourage and legitimate even the most outrageously partisan gerrymandering, see 394 U. S., at 551–552 (Harlan, J., dissenting); *id.*, at 555 (WHITE, J., dissenting). The plain fact is that in the computer age, this type of political and discriminatory gerrymandering can be accomplished entirely consistently with districts of equal population.[2]

---

prior districts, and avoiding contests between incumbent Representatives." *Ante*, at 740. Although it is remarkable that the Court thus silently discards important features of *Kirkpatrick* while simultaneously invoking *stare decisis* to defend the remainder of that decision, see *ante*, at 778–780 (WHITE, J., dissenting), I welcome this change in the law. It is to be hoped that this new standard will be applied with a strong measure of deference to the legitimate concerns of the State. See *ante*, at 760, n. 26 (STEVENS, J., concurring) (recognizing that courts should "give greater weight to the importance of the State's interests and the consistency with which those interests are served than to the size of the deviations").

[2] An illustration is the recent congressional redistricting in Illinois. After the Illinois Legislature had failed to enact a reapportionment plan, a three-judge District Court chose among four plans varying from 0.02851% to 0.14797% in *maximum* deviation. Following *Kirkpatrick*, the majority of the court chose the plan with the smallest deviation, one that was a "Democratic plan" designed to maximize Democratic voting strength at the expense of Republicans. See *In re Illinois Congressional Districts Reapportionment Cases*, No. 81–C–3915 (ND Ill. 1981), summarily aff'd *sub nom. Ryan* v. *Otto*, 454 U. S. 1130 (1982). A commentator noted:

"The Democratic victory was due in part to a sophisticated computer program that made possible the creation of districts having almost exactly equal population. The most populous district has only 171 more people than the least populous one. That accuracy seemed to impress the court, which expressed no concern that the new district lines divided cities and carved up counties all over the state." Illinois Map is Unpleasant Surprise for the GOP, 40 Congressional Quarterly 573 (1982).

See also *Carstens* v. *Lamm*, 543 F. Supp. 68, 73–74, and 84, n. 39 (Colo. 1982) (three-judge District Court reviewed five major redistricting plans,

I therefore continue to believe that the Constitution permits variations from "theoretical 'exactitude' in recognition of the impracticality of applying the *Kirkpatrick* rule as well as in deference to legitimate state interests." *White* v. *Weiser, supra,* at 798 (POWELL, J., concurring). Certainly when a State has adopted a districting plan with an average population deviation of 0.1384%, and a maximum deviation of 0.6984%, it has complied with the Constitution's mandate that population be apportioned equally among districts.

## II

The extraordinary map of the New Jersey congressional districts, see *ante,* following p. 744, prompts me to comment on the separate question of gerrymandering—"the deliberate and arbitrary distortion of district boundaries and populations for partisan or personal political purposes," *Kirkpatrick, supra,* at 538 (Fortas, J., concurring). I am in full agreement with JUSTICE WHITE's observation more than a decade ago that gerrymandering presents "a far greater potential threat to equality of representation" than a State's failure to achieve

---

including the Republican legislature's plan with a difference between largest and smallest districts of seven persons, *i. e.,* a maximum deviation of 0.0015%, and the Democratic Governor's plan with a 15-person difference, *i. e.,* a maximum deviation of 0.0031%); *O'Sullivan* v. *Brier,* 540 F. Supp. 1200, 1202 (Kan. 1982) (three-judge District Court asked to choose between a Democratic plan with a 0.11% maximum deviation and a Republican plan with a 0.09% maximum deviation).

These cases also illustrate an additional unfortunate side effect of *Kirkpatrick:* the increasing tendency of state legislators and Governors—who have learned that any redistricting plan is "vulnerable to after-the-fact attack by anyone with a complaint and a calculator," *ante,* at 778 (WHITE, J., dissenting)—to spurn compromise in favor of simply drawing up the most partisan plan that appears consistent with the population equality criterion. No longer do federal district courts merely review the constitutionality of a State's redistricting plan. Rather, in many cases they are placed in the position of choosing a redistricting plan in the first instance.

"precise adherence to admittedly inexact census figures." *Wells* v. *Rockefeller*, 394 U. S. 542, 555 (1969) (dissenting opinion). I also believe that the injuries that result from gerrymandering may rise to constitutional dimensions. As JUSTICE STEVENS observes, if a State's electoral rules "serve no purpose other than to favor one segment—whether racial, ethnic, religious, economic, or political—that may occupy a position of strength at a particular point in time, or to disadvantage a politically weak segment of the community, they violate the constitutional guarantee of equal protection." *Ante*, at 748 (concurring opinion). Moreover, most gerrymandering produces districts "without any regard for political subdivision or natural or historical boundary lines," *Reynolds* v. *Sims*, 377 U. S. 533, 578–579 (1964), a result that is profoundly destructive of the apportionment goal of "fair and effective representation," *id.*, at 565. A legislator cannot represent his constituents properly—nor can voters from a fragmented district exercise the ballot intelligently—when a voting district is nothing more than an artificial unit divorced from, and indeed often in conflict with, the various communities established in the State.[3] The map attached to the Court's opinion illustrates this far better than words can describe.

I therefore am prepared to entertain constitutional challenges to partisan gerrymandering that reaches the level of discrimination described by JUSTICE STEVENS. See *ante*, at 748 (concurring opinion). I do not suggest that the shape of a

---

[3] In *Carstens* v. *Lamm, supra,* the three-judge District Court noted that preserving an entire city as one voting district facilitated "voter identity": "Most voters know what city and county they live in, but fewer are likely to know what congressional district they live in if the districts split counties and cities. If a voter knows his congressional district, he is more likely to know who his representative is. This presumably would lead to more informed voting." 543 F. Supp., at 98, n. 78. It also is likely to lead to a Representative who knows the needs of his district and is more responsive to them.

districting map itself invariably is dispositive. Some irregularity in shape is inevitable, with the degree of irregularity depending primarily on the geographic and political boundaries within the State, as well as the distribution of its population. Moreover, political considerations, even partisan ones, are inherent in a democratic system. A court, therefore, should not "attemp[t] the impossible task of extirpating politics from what are the essentially political processes of the sovereign States." *Gaffney,* 412 U. S., at 754. Finally, I do not suggest that a legislative reapportionment plan is invalid whenever an alternative plan might be viewed as less partisan or more in accord with various apportionment criteria. The state legislature necessarily must have discretion to accommodate competing considerations.

I do believe, however, that the constitutional mandate of "fair and effective representation," *Reynolds, supra,* at 565, proscribes apportionment plans that have the purpose and effect of substantially disenfranchising identifiable groups of voters. Generally, the presumptive existence of such unconstitutional discrimination will be indicated by a districting plan the boundaries of which appear on their face to bear little or no relationship to any legitimate state purpose. As JUSTICE STEVENS states, "dramatically irregular shapes may have sufficient probative force to call for an explanation," *ante,* at 755 (concurring opinion); "drastic departures from compactness are a signal that something may be amiss," *ante,* at 758; and "[e]xtensive deviation from established political boundaries is another possible basis for a prima facie showing of gerrymandering," *ibid.* In such circumstances, a State should be required to provide a legitimate and nondiscriminatory explanation for the districting lines it has drawn. See *Reynolds, supra,* at 568 (the apportionment "presented little more than crazy quilts, completely lacking in rationality, and could be found invalid on that basis alone").

In this case, one cannot rationally believe that the New Jersey Legislature considered factors other than the most

partisan political goals and population equality. It hardly could be suggested, for example, that the contorted Districts 3, 5, and 7 reflect any attempt to follow natural, historical, or local political boundaries.[4] Nor do these district lines reflect any consideration of the likely effect on the quality of representation when the boundaries are so artificial that they are likely to confound the Congressmen themselves. As Judge Gibbons stated eloquently in his dissent below:

> "The apportionment map produced by P. L. 1982, c. 1 leaves me, as a citizen of New Jersey, disturbed. It creates several districts which are anything but compact, and at least one district which is contiguous only for yachtsmen. While municipal boundaries have been maintained, there has been little effort to create districts having a community of interests. In some districts, for example, different television and radio stations, different newspapers, and different transportation systems serve the northern and southern localities. Moreover the harshly partisan tone of Speaker Christopher Jackman's letter to Ernest C. Reock, Jr. is disedifying, to say the least. It is plain, as well, that partisanship produced artificial bulges or appendages of two districts so as to place the residences of Congressmen Smith and Courter in districts where they would be running against incumbents." *Daggett* v. *Kimmelman*, 535 F. Supp. 978, 984 (NJ 1982).

This summary statement by Judge Gibbons, a resident of New Jersey, is powerful and persuasive support for a con-

---

[4] It may be noted, for example, that the plan adopted by New Jersey (the Feldman Plan) divided the State's 21 counties into 55 fragments. The plan proposed by Professor Reock, introduced by Assemblyman Hardwick, created 45 county fragments, and the existing congressional districts divided the counties into 42 fragments. See App. 123 (Appendix A to Affidavit of Samuel A. Alito, Executive Director of the Office of Legislative Services of the New Jersey Legislature).

clusion that the New Jersey Legislature's redistricting plan is an unconstitutional gerrymander. Cf. *ante*, at 764, n. 33 (STEVENS, J., concurring). Because this precise issue was not addressed by the District Court, however, it need not be reached here. As to the issue of population equality, I dissent for the reasons set forth above and in JUSTICE WHITE's dissenting opinion.