**[J-20-2022] [MO: Baer, C.J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**


CAROL ANN CARTER, MONICA
PARRILLA, REBECCA POYOUROW,
WILLIAM TUNG, ROSEANNE MILAZZO,
BURT SIEGEL, SUSAN CASSANELLI, LEE
CASSANELLI, LYNN WACHMAN,
MICHAEL GUTTMAN, MAYA FONKEU,
BRADY HILL, MARY ELLEN BALCHUNIS,
TOM DEWALL, STEPHANIE MCNULTY
AND JANET TEMIN,

    Petitioners


    v.


LEIGH M. CHAPMAN, IN HER OFFICIAL
CAPACITY AS THE ACTING SECRETARY
OF THE COMMONWEALTH OF
PENNSYLVANIA; JESSICA MATHIS, IN
HER OFFICIAL CAPACITY AS DIRECTOR
FOR THE PENNSYLVANIA BUREAU OF
ELECTION SERVICES AND NOTARIES,

    Respondents

------------------------------------------------------------

PHILIP T. GRESSMAN; RON Y. DONAGI;
KRISTOPHER R. TAPP; PAMELA GORKIN;
DAVID P. MARSH; JAMES L.
ROSENBERGER; AMY MYERS; EUGENE
BOMAN; GARY GORDON; LIZ MCMAHON;
TIMOTHY G. FEEMAN; AND GARTH
ISAAK,

    Petitioners


    v.

: No. 7 MM 2022
:
:
:
: ARGUED:  February 18, 2022
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

LEIGH M. CHAPMAN, IN HER OFFICIAL : 
CAPACITY AS THE ACTING SECRETARY :
OF THE COMMONWEALTH OF :
PENNSYLVANIA; JESSICA MATHIS, IN :
HER OFFICIAL CAPACITY AS DIRECTOR :
FOR THE PENNSYLVANIA BUREAU OF :
ELECTION SERVICES AND NOTARIES, :
                                   :
             Respondents           :

## DISSENTING OPINION

**JUSTICE TODD**

**OPINION FILED:  March 9, 2022**
**DECIDED:  February 23, 2022**

I dissent to the majority's selection of the Carter Plan as the congressional redistricting plan.

Initially, I observe that our Court was compelled to act in this matter because the General Assembly and the Governor failed to agree on a congressional redistricting plan in the aftermath of the 2020 Census, and a swift and final resolution of the legal and factual disputes surrounding the plan adopted by the Special Master was necessitated by the election timetable for the looming May 17, 2022 Primary Election.  As emphasized by the majority, this is not a task our Court sought, and, as a general matter, is one which our Court views as "unwelcome."  *See* Majority Opinion at 2 (quoting *League of Women Voters v. Commonwealth*, 178 A.3d 737, 823 (Pa. 2018) ("*LWV II*")).  Nevertheless, whenever the legislative and executive branches are at an impasse and unable to enact a redistricting plan into law, it falls to the judiciary as a coequal branch of our tripartite system of constitutional governance to determine an appropriate redistricting plan, and, when called upon, we will faithfully fulfill that solemn duty.  *LWV II*, 178 A.3d at 822.

In exercising that duty, I respectfully reject the majority's selection of the Carter Plan.  Rather, based on my analysis of the neutral constitutional criteria we set forth in

*LWV II*, I would select the plan developed by the "Gressman Math/Science" Petitioners – the "Gressman Plan" – as I consider it to most closely adhere to those neutral standards.[1]

I begin with some notable areas in which my views align with the majority. Like the majority, I disapprove of the rationale the Special Master used to justify adopting her chosen plan – H.B. 2146 – and I recognize that an examination of how well a congressional redistricting plan comports with the four neutral criteria our Court articulated in *LWV II*[2] is of paramount importance in any assessment of whether that plan provides each voter what is guaranteed them by the Free and Equal Clause of the Pennsylvania Constitution[3] – namely, that their vote is given full effect and not impermissibly diluted. *LWV II*, 178 A.3d at 816.

I likewise agree that the Special Master improperly accorded H.B. 2146 undue deference as "presumptively reasonable and legitimate" because, even though it was only a bill that never acquired the force of law (as it was vetoed by the Governor), in her view, it best represented the will of the voters among the competing plans. Report of the Special Master, 2/7/22, at 213-215. Respectfully, I find the Special Master's assertion unfounded, given that, under our Commonwealth's Constitution, and the duly enacted statutory framework governing the redistricting process promulgated thereto, the responsibility for approving a congressional redistricting plan is shared equally by the Governor and the General Assembly. *See LWV II*, 178 A.3d at 742 ("Pennsylvania's

---

[1] As the majority recognizes, and as I discuss below, any plan we pick must also satisfy the requirements of the federal Voting Rights Act, 52 U.S.C. § 10301. *LWV II*, 178 A.3d at 817 n.72.

[2] Congressional districts created under a redistricting plan must: (1) be compact; (2) be contiguous; (3) be as nearly equal in population as practicable; and (4) not divide any county, city, incorporated town, borough, township, or ward, except where necessary to ensure equality of population. *LWV II*, 178 A.3d at 816-17.

[3] Pa. Const. art. I, § 5 (guaranteeing that all "[e]lections shall be free and equal.").

congressional districts are drawn by the state legislature as a regular statute, subject to veto by the Governor."). Because the Governor is elected by the voters of the entire Commonwealth, there is, therefore, no basis to regard his veto of the proposed plan in this matter as somehow less representative of the will of the people than the legislature's own enactment of that plan. H.B. 2146 therefore stands on equal footing with all other plans submitted to this Court – including the Governor's alternative proposed plan — namely, that it is a plan worthy of thoughtful consideration. It is not entitled to special weight merely because it was passed by the General Assembly, but never became law. *See Sixty-Seventh Minnesota State Senate v. Beems*, 406 U.S. 187, 197 (1972) (recognizing that, when a reapportionment plan is offered by the legislature but vetoed by the Governor, and the Governor offers his own plan which is not adopted by the legislature, both plans stand on an equal footing and are equally worthy of "thoughtful consideration.").

Further, the majority properly rejected the Special Master's automatic disqualification of plans which do not meet the mathematical minimum of a one-person deviation from the ideal district population. As the majority notes, a slightly greater deviation from the ideal population of plus or minus one person, resulting in a total deviation of two persons, is not, in and of itself, disqualifying. A marginally greater population deviation can be justified on the basis of "consistently applied legislative policies" that are nondiscriminatory, such as compactness, respect for municipal boundaries, preserving cores of prior districts, and avoiding contests between incumbent members of Congress. *Karcher v. Daggett*, 462 U.S. 725, 740 (1983).

However, my agreement with the majority largely ends there. Most critically, in selecting the optimal redistricting plan from those before us, I disagree that, in this instance, we need to look beyond the constitutionally-specified neutral criteria, and

examine subordinate considerations. As the majority properly acknowledges, we recognized in *LWV II* that the four neutral criteria – contiguity, compactness, equal population, and splitting of political subdivisions – are the irreducible minimum requirements of Article I, Section 5 every redistricting plan must meet. *See LWV II*, 178 A.3d at 816. Indeed, as the majority aptly terms them, they are "core" requirements, and the other considerations our Court enumerated in *LWV II* such as preservation of communities of interest, preservation of prior districts, protection of incumbents, and partisan fairness are "*subordinate* historical considerations." Majority Opinion at 34 (emphasis added); *see also LWV II,* 178 A.3d at 817 ("We recognize that other factors have historically played a role in the drawing of legislative districts, such as the preservation of prior district lines, protection of incumbents, or the maintenance of the political balance which existed after the prior reapportionment. However, we view these factors to be wholly subordinate to the neutral criteria of compactness, contiguity, minimization of the division of political subdivisions, and maintenance of population equality among congressional districts." (citation omitted)). In my view, assessment of subordinate or secondary considerations such as partisan fairness, or whether a plan represents the least change from a prior congressional districting plan, is necessary *only* when a court must choose among various plans that are equal with respect to their compliance with the core criteria. Where, however, one plan is superior to all others, as measured by the closeness of its adherence to these criteria, I find it unnecessary for a court to consider the subordinate considerations. While I recognize that none of the submitted plans are perfect in this regard, I consider the Gressman Plan to best conform to the core criteria of all the plans submitted.

The Gressman Plan was crafted by a group of 12 professors of mathematics, statistics, computer science, geography, and data science who teach at Pennsylvania's institutions of higher learning, and who also live and vote in the Commonwealth. *See* Petition for Review *filed in Gressman v. Chapman*, 465 M.D. 2021 (Pa. Cmwlth.). As the Gressman Petitioners have described in their brief to our Court, they utilized a process known as computational redistricting, which, as a general matter, relies on raw population data and mathematical and statistical algorithms to generate maps based solely on neutral redistricting criteria. *See* Gressman Brief in Support of Exceptions to Special Master's Report at 8 (citing, *inter alia*, Bruce E. Cain *et al.*, *A Reasonable Bias Approach to Gerrymandering: Using Automated Plan Generation to Evaluate Redistricting Proposals*, 59 Wm. & Mary L. Rev. 1521, 1536 (2018) (opining that constructing computational algorithms that create maps based on the neutral principles of "preservation of extant communities, compactness, contiguity, and adherence to one-person, one-vote guidelines" minimizes the influence of human bias in the map drawing process)). In my view, the Gressman Plan, which was the product of this process, more closely adheres to *all* of the core criteria, collectively, than any of the plans currently before our Court, as measured by objective metrics.[4]

First, the Gressman Plan, like all the plans submitted to our Court, satisfies the requirement that its designated districts be contiguous.

---

[4] In making this assessment, as does the majority, I rely on the comprehensive comparison of Dr. Daryl DeFord of all of the plans which have been submitted to our Court. *See* Majority Opinion at 24 (discussing DeFord analysis).

Second, the Gressman plan has the least minimum population deviation in congressional districts as is mathematically possible – one person – achieving ideal population equality of each district at 764,864 or 764,865 persons per district.

Third, with respect to compactness, which is a measure of the geographic or geometric regularity of the congressional districts created, the Gressman Plan is as good as or better than the other plans, and in particular the Carter Plan, according to four widely accepted statistical measures:  Polsby–Popper, Reock, Convex Hull, and Cut Edges. *See generally* Report of the Special Master, 2/7/22, at 25, 69, 77 (discussing measures); Stephen Ansolabehere *et al.*, *A Two Hundred-Year Statistical History of the Gerrymander*, 77 Ohio St. L.J. 741, 746 (2016) (discussing Polsby–Popper, Reock, and Convex Hull measures); Expert Report of Moon Duchin, 1/24/22, at 6 (Exhibit A to Exceptions of Governor Wolf) (discussing Cut Edges measure).  While I observe that some of the other submitted plans yield slightly more compact valuations on individual measures, there is, as the majority notes, tension between assuring compactness and minimizing political subdivisions splits.  *See* Majority Opinion at 28 ("It is easily comprehended that adherence to county and city lines will decrease compactness because many of the boundaries follow geographic features such as rivers, which meander across our Commonwealth.").

In that regard, and finally, the splitting of political subdivisions, as a general proposition, has a particularly pernicious effect in diluting the vote of the residents of those subdivisions, and is to be scrupulously avoided unless absolutely necessary to maintain

equality of population.[5]  *LWV II,* 178 A.3d at 815.  The Gressman Plan is superlative in that regard.  Dr. DeFord's analysis shows that, overall, the Gressman plan divides only 49 political subdivisions, which is 2 fewer than the next best plan in this category, the Senate Democratic Caucus Plan (which, unlike the Gressman Plan, splits the City of Pittsburgh).  As compared to H.B. 2146, the Gressman Plan divides 5 fewer political subdivisions, and it divides 9 fewer political subdivisions than the Carter Plan, which also divides one more city — Harrisburg — than does the Gressman Plan.

Consequently, the Gressman Plan, uniquely, has the twin salutary benefits of maintaining perfect population equality among congressional districts, while preserving the most number of intact political subdivisions within those districts.  This establishes, in my view, the plan's superiority over all the others which our Court has considered.[6]

For these reasons, I would have selected the Gressman Plan.  Accordingly, I respectfully dissent.

---

[5] In this regard, I agree with the majority that our Constitution does not set forth a hierarchical preference of the various types of enumerated political subdivisions which should be protected against splitting.  *See* Majority Opinion at 33.  As the majority notes, plans must be scrutinized to ensure that, as a whole, the number of political subdivision splits are minimized in accordance with consideration of all relevant objective criteria.  *Id.*
[6]  There is no suggestion by any of the parties that the Gressman Plan, which yields at least two majority-minority districts, is violative of the Voting Rights Act, *see supra* note 1, and I discern no such violation on the basis of this record.